**ROHM AND HAAS COMPANY and Rohm and Haas Delaware Valley, Inc. and Pennsylvania Department of Environmental Resources, Appellees,**

**v.**

**CONTINENTAL CASUALTY COMPANY; International Insurance Company; Aetna Casualty & Surety Company; AIU Insurance Company; Allianz Underwriters Insurance Company; Allstate Insurance Company (As Suc-** cessor to Northbrook Excess and Surplus Company, formerly known as Northbrook Insurance Company Casualty Company of Reading, Pa.); American Home Assurance Company; American Insurance Company; American Reinsurance Company; American Universal Insurance Company; California Union Insurance Company; Central National Insurance Company of Omaha; Columbia Casualty Company; The Employers Liability Assurance Corporation, Limited Employers Commercial Union Insurance Company of America; Federal Insurance Company; Fireman's Fund Insurance Company; First State Insurance Company; General Re–Insurance Corporation; Gibraltar Casualty Company; Granite State Insurance Company; Harbor Insurance Company; The Home Insurance Company; Insurance Company of North America; Insurance Company of the State of Pennsylvania; Interstate Fire & Casualty Company; Lexington Insurance Company; Lumbermens Mutual Casualty Company; Midland Insurance Company; Mission National Insurance Company; Mutual Fire, Marine & Inland Insurance Company; National Union Fire Insurance Company of Pittsburgh, PA; New Hampshire Insurance Company; Northbrook Excess Surplus Insurance Company, formerly known as Northbrook Insurance Company; North Star Re–Insurance Corporation; Old Republic Insurance Company; The Pennsylvania Insurance Guaranty Association; Prudential Re–Insurance Company; Puritan Insurance Company; Stonewall Insurance Company; Transit Casualty Company; The Traveler's Indemnity Company; Certain Underwriters at Lloyd's of London (including Syndicate Nos. 015, 016, 023, 033, 035, 036, 049, 053, 056, 057, 059, 060, 064, 065, 069, 079, 086,

088, 090, 099, 109, 126, 130, 151, 164, 169, 173, 174, 175, 179, 183, 188, 190, 193, 199, 204, 205, 208, 210, 211, 212, 214, 219, 231, 235, 238, 241, 250, 263, 276, 278, 279, 300, 301, 311, 316, 317, 322, 342, 346, 347, 356, 360, 365, 371, 373, 383, 404, 405, 408, 417, 425, 427, 431, 433, 470, 471, 472, 475, 476, 479, 484, 496, 499, 506, 507, 510, 518, 538, 539, 553, 555, 556, 558, 567, 568, 576, 581, 583, 596, 604, 610, 618, 620, 629, 634, 646, 650, 651, 652, 653, 661, 668, 674, 677, 679, 694, 701, 727, 729, 751, 755, 763, 768, 772, 773, 783, 793, 795, 796, 797, 799, 819, 838, 846, 849, 851, 867, 870, 884, 896, 899, 909, 918, 924, 935, 943, 947, 948, 960, 964, 987, 989, 990, 998) and certain London Market Companies (including) Accident & Casualty Insurance Company; Agrippina Versicherungs A.G.; Alba General Insurance Company Ltd.; Allianz Versicherungs Aktiengesellschaft; Amsterdam–London Verzekering MIJ N.V.; Anglo–French Insurance Company Ltd.; Argonaut Northwest Insurance Company; Assicurazioni Generalai S.P.A. (U.K. Branch); Baloise Fire Insurance Company; Bellefonte Insurance Company (U.K.) Ltd.; Bellefonte Re–Insurance Company (U.K.) Ltd.; The Bermuda Fire & Marine Insurance Company Ltd.; British & Overseas Insurance Company Ltd.; The British Aviation Insurance Company Ltd.; British National Insurance Company Ltd.; Brittany Insurance Company Ltd.; Casualty, Fire and Accident Underwriters; Chemical Insurance Company Ltd.; CNA International Reinsurance Company Ltd.; A.G. de 1824 Companie Belges D'Assurances Generales; Compagnie D'Assurances Maritimes Aeriennes et Terrestres; Assurances Generales Belges (1830); Compagnie Europeene D'assurances Industrielles S.A.; Compania Agricola de Seguros, Bogota, Colombia; Compania Agricola de Argentina de Seguros; Delta Lloyd Non Life Insurance; Delta Lloyd Schadeverzerkering N.V.; Dominion Insurance Company Ltd.; Dominion Insurance Company on behalf of Anglo Saxon Insurance Association Ltd.; Dominion Insurance Company on behalf of British Merchants Insurance Company Ltd.; Dominion Insurance Company on behalf of London & Edinburgh Insurance Company Ltd.; Dominion Insurance Company on Behalf Royal Scottish Insurance Company; Dominion Insurance Company on behalf of Trent Insurance Company Ltd.; Dominion Insurance Company on behalf of Vanguard Insurance Company Ltd.; Dominion Insurance Company on behalf of World Marine and General Insurance Corporation Ltd.; Drake Insurance Company Ltd.; Eisen und Stahl Ruckversicherungs A.G.; English & American Insurance Company Ltd.; Eurinco Allgemeine Versicherungs – A.G.; European General Reinsurance Company of Zurich; Europeesche Goederen – En Reisbagage Verzekering Maatschappij N.V.; Excess Insurance Company Ltd.; FM Insurance Company Ltd.; Fidelidade Grupo Segurador; Folksam International Insurance Company (U.K.) Ltd.; Gresham Insurance Society Ltd.; Groupe Josi Reinsurance Company S.A.; Guildhall Insurance Company Ltd.; Hafez Insurance Company, Tehran, Iran; Haftpflichtverband Der Deutschen Industrie V.A.G.; Helvetia Accident Swiss Insurance Company; Hull Underwriters Association; Insco Ltd.; Interlloyd Verzekering MIJ N.V.; The Israel Reinsurance Company Ltd.; Italia Assicurazioni S.P.A.; London & Edinburgh General Insurance Company; The London and Overseas Insurance Company PLC; The Mercantile and General Reinsurance Company PLC; Minster Insurance Company

Ltd.; National Casualty Company of America Ltd.; New Hampshire Insurance Company; New London Reinsurance Company Ltd.; Nissan Fire & Marine Insurance Company Ltd.; Nisshin Fire & Marine Insurance Company Ltd.; North Atlantic Insurance Company Ltd.; The Orion Insurance Company PLC; Pacific & General Insurance Company Ltd.; La Preservatrice C.A. D'Assurances A.I.R.D.; Reaseguradora Nacional de Venezuela Compania Anonima; Rheinland Versicherungs – A.G.; River Thames Insurance Company Ltd.; N.V. Rotterdamse Assurantiekas; Royale Belges S.A. Assurances; Sovereign Marine & General Insurance Company Ltd.; Sphere Insurance Company Ltd.; Sphere Drake Insurance Public Limited Company; St. Helens Insurance Company Ltd.; St. Katherine Insurance Company PLC; Stronghold Insurance Company Ltd.; The Sumitomo Marine & Fire Insurance Company (Europe) Ltd.; Sumitomo Marine & Fire Insurance Company Ltd.; Swiss National Insurance Company Ltd.; Swiss Union General Insurance Company Ltd.; Turegum Insurance Company; Unionamerica Insurance Company Ltd.; Union Atlantique de Reassurances; Unione Italia di Riassicurazione; United Standard Insurance Company Ltd.; The Victory Insurance Company Limited; Winterthur Swiss Insurance Company; World Auxiliary Insurance Corporation Ltd.; The Yasuda Fire & Marine Insurance Company (of Europe) Ltd.; Zurich International Limited c/o Mendes and Mount. Three Park Avenue, New York, N.Y. 10016–5902 and A. Carole Whitmoyer and Mike Segal as Co–Personal Representatives of the Estate of Clarence W. Whitmoyer c/o Broad and Cassle. 175 N.W. 1 St Ave, Suite 2000, Miami, Fl 33128; Smithkline Beecham, Inc; Edith M. Grumbine, Appellants.

Appeal of The Home Insurance Company.

Insurance Environmental Litigation Association, Bethlehem Steel Corp., Cabot Corp., Coltec Industries Inc., Crown Cork & Seal Co. Inc., Gould Electronics Inc., Peco Energy Co., PPG Industries, Sun Co. Inc., Unisource Worldwide Inc., and Unisys Corp., United Policy Holders.

Rohm and Haas Company and Rohm and Haas Delaware Valley, Inc. and Pennsylvania Department of Environmental Resources, Appellees,

v.

Continental Casualty Company; International Insurance Company; Aetna Casualty & Surety Company; AIU Insurance Company; Allianz Underwriters Insurance Company; Allstate Insurance Company (as Successor to Northbrook Excess and Surplus Company, formerly known as Northbrook Insurance Company Casualty Company of Reading, Pa.); American Home Assurance Company; American Insurance Company; American Reinsurance Company; American Universal Insurance Company; California Union Insurance Company; Central National Insurance Company of Omaha; Columbia Casualty Company; The Employers Liability Assurance Corporation, Limited Employers Commercial Union Insurance Company of America; Federal Insurance Company; Fireman's Fund Insurance Company; First State Insurance Company; General Re-Insurance

Corporation; Gibraltar Casualty Company; Granite State Insurance Company; Harbor Insurance Company; The Home Insurance Company; Insurance Company of North America; Insurance Company of the State of Pennsylvania; Interstate Fire & Casualty Company; Lexington Insurance Company; Lumbermens Mutual Casualty Company; Midland Insurance Company; Mission National Insurance Company; Mutual Fire, Marine & Inland Insurance Company; National Union Fire Insurance Company of Pittsburgh, PA; New Hampshire Insurance Company; Northbrook Excess Surplus Insurance Company, formerly known as Northbrook Insurance Company; North Star Re–Insurance Corporation; Old Republic Insurance Company; The Pennsylvania Insurance Guaranty Association; Prudential Re–Insurance Company; Puritan Insurance Company; Stonewall Insurance Company; Transit Casualty Company; The Traveler's Indemnity Company; Certain Underwriters at Lloyd's of London (including Syndicate Nos. 015, 016, 023, 033, 035, 036, 049, 053, 056, 057, 059, 060, 064, 065, 069, 079, 086, 088, 090, 109, 126, 130, 151, 164, 169, 173, 174, 175, 179, 183, 188, 190, 193, 199, 204, 205, 208, 210, 211, 212, 214, 219, 231, 235, 238, 241, 250, 263, 276, 278, 279, 300, 301, 311, 316, 317, 322, 342, 346, 347, 356, 360, 365, 371, 373, 383, 404, 405, 408, 417, 425, 427, 431, 433, 470, 471, 472, 475, 476, 479, 484, 496, 499, 506, 507, 510, 518, 538, 539, 553, 555, 556, 557, 558, 567, 568, 576, 581, 583, 596, 604, 610, 618, 620, 629, 634, 646, 650, 651, 652, 653, 661, 668, 674, 677, 679, 694, 701, 727, 729, 751, 755, 763, 768, 772, 773, 783, 793, 795, 796, 797, 799, 819, 838, 846, 849, 851, 867, 870, 884, 896, 899, 909, 918, 924, 935, 943, 947, 948, 960, 964, 987, 989, 990, 998) and certain London Market Companies (including) Accident & Casualty Insurance Company; Agrippina Versicherungs A.G.; Alba General Insurance Company Ltd.; Allianz Versicherungs Aktiengesellschaft; Amsterdam–london Verzekering MIJ N.V.; Anglo–French Insurance Company Ltd.; Argonaut Northwest Insurance Company; Assicurazioni Generalai S.P.A. (U.K. Branch); Baloise Fire Insurance Company; Bellefonte Insurance Company (U.K.) Ltd.; Bellefonte Re–Insurance Company (U.K.) Ltd.; The Bermuda Fire & Marine Insurance Company Ltd.; British & Overseas Insurance Company Ltd.; The British Aviation Insurance Company Ltd.; British National Insurance Company Ltd.; Brittany Insurance Company Ltd.; Casualty, Fire and Accident Underwriters; Chemical Insurance Company Ltd.; CNA International Reinsurance Company Ltd.; A.G. de 1824 Companie Belges D'Assurances Generales; Compagnie D'Assurances Maritimes Aeriennes et Terrestres; Assurances Generales Belges (1830); Compagnie Europeene D'Assurances Industrielles S.A.; Compania Agricola de Seguros, Bogota, Colombia; Compania Agricola de Argentina de Seguros; Delta Lloyd Non Life Insurance; Delta Lloyd Schadeverzerkering N.V.; Dominion Insurance Company Ltd.; Dominion Insurance Company on behalf of Anglo Saxon Insurance Association Ltd.; Dominion Insurance Company on behalf of British Merchants Insurance Company Ltd.; Dominion Insurance Company on behalf of London & Edinburgh Insurance Company Ltd.; Dominion Insurance Company on behalf of Royal Scottish Insurance Company; Dominion Insurance Company on behalf of Trent Insurance Company Ltd.; Dominion Insurance Company on behalf of Vanguard Insurance Company Ltd.; Dominion Insurance Company on behalf of World Marine and General Insurance Corporation Ltd.; Drake Insurance Company Ltd.; Eisen und Stahl Ruckversicherungs A.G.; English & American Insurance Company Ltd.; Eurinco Allgemeine Versicherungs—A.G.; European General Reinsurance Company of Zurich; Europeesche Goederen—En Reisbagage Verzekering Maatschappij N.V.; Excess Insurance Company Ltd.; FM Insurance Company

Ltd.; Fidelidade Grupo Segurador; Folksam International Insurance Company (U.K.) Ltd.; Gresham Insurance Society Ltd.; Groupe Josi Reinsurance Company S.A.; Guildhall Insurance Company Ltd.; Hafez Insurance Company, Tehran, Iran; Haftpflichtverband Der Deutschen Industrie V.A.G.; Helvetia Accident Swiss Insurance Company; Hull Underwriters Association; Insco Ltd.; Interlloyd Verzekering MIJ N.V.; The Israel Reinsurance Company Ltd.; Italia Assicurazioni S.P.A.; London & Edinburgh General Insurance Company; The London and Overseas Insurance Company PLC; The Mercantile and General Reinsurance Company PLC; Minster Insurance Company Ltd.; National Casualty Company of America Ltd.; New Hampshire Insurance Company; New London Reinsurance Company Ltd.; Nissan Fire & Marine Insurance Company Ltd.; Nisshin Fire & Marine Insurance Company Ltd.; North Atlantic Insurance Company Ltd.; The Orion Insurance Company PLC; Pacific & General Insurance Company Ltd.; La Preservatrice C.A. D'Assurances A.I.R.D.; Reaseguradora Nacional De Venezuela Compania Anonima; Rheinland Versicherungs – A.G.; River Thames Insurance Company Ltd.; N.V. Rotterdamse Assurantiekas; Royale Belges S.A. Assurances; Sovereign Marine & General Insurance Company Ltd.; Sphere Insurance Company Ltd.; Sphere Drake Insurance Public Limited Company; St. Helens Insurance Company Ltd.; St. Katherine Insurance Company PLC; Stronghold Insurance Company Ltd.; The Sumitomo Marine & Fire Insurance Company (Europe) Ltd.; Sumitomo Marine & Fire Insurance Company Ltd.; Swiss National Insurance Company Ltd.; Swiss Union General Insurance Company Ltd.; Turegum Insurance Company; Unionamerica Insurance Company Ltd.; Union Atlantique de Reassurances; Unione Italia di Riassicurazione; United Standard Insurance Company Ltd.; The Victory Insurance Company Limited; Winterthur Swiss Insurance Company; World Auxiliary Insurance Corporation Ltd.; The Yasuda Fire & Marine Insurance Company (of Europe) Ltd.; Zurich International Limited c/o Mendes and Mount. Three Park Avenue, New York, N.Y. 10016–5902 and A. Carole Whitmoyer and Mike Segal as Co–Personal Representatives of the Estate of Clarence W. Whitmoyer c/o Broad and Cassle. 175 N.W. 1 St Ave, Suite 2000, Miami, Fl 33128; Smithkline Beecham, Inc; Edith M. Grumbine, Appellants.

Appeal of Certain Underwriters at Lloyd's London, and Certain London Market Insurance Companies (Hereinafter "Plaisted and Companies").

Insurance Environmental Litigation Association, Bethlehem Steel Corp., Cabot Corp., Coltec Industries Inc., Crown Cork & Seal Co. Inc., Gould Electronics Inc., Peco Energy Co., PPG Industries, Sun Co. Inc., Unisource Worldwide Inc., and Unisys Corp., United Policy Holders.

Superior Court of Pennsylvania.

Argued Dec. 10, 1998.

Filed May 6, 1999.

Reargument Denied July 30, 1999.

Nancy J. Gellman and Robert N. Feltoon, Philadelphia, for Rohm and Haas Co. and Haas Delaware Valley, Inc., appellees.

Jerome J. Shestack, Philadelphia, for Certain Underwriters at Lloyd's of London.

William J. Brennan, III, Princeton, NJ, for The Home Ins. Co.

Before CAVANAUGH, TAMILIA and HESTER, JJ.

CAVANAUGH, J.:

¶ 1 This appeal involves insurance coverage for the clean-up of a serious environmental pollution problem in the soil, groundwater and surface water upon and in the area of a manufacturing site formerly owned and operated by appellees, Rohm and Haas Company and Rohm and Haas, Delaware Valley, Inc. (hereinafter Rohm & Haas). Rohm & Haas' strict liability under federal law for the environmental damage at the site was not in dispute. The question to be decided at the trial of this action was whether Rohm & Haas' various insurers, appellants herein, were under a duty to indemnify Rohm & Haas for the costs associated with clean-up of the site under excess liability policies the insurers issued which were in force during the years Rohm & Haas owned and operated the facility. It was the insurers' position at trial that the policies at issue were void *ab initio* because Rohm & Haas allegedly procured them fraudulently. After a lengthy trial, the jury determined, *inter alia*, that Rohm & Haas failed to disclose material information to its insurers regarding the existing contamination when it applied for the excess liability policies in question and, accordingly, that the insurers were under no duty to indemnify Rohm & Haas for payment of the sums necessary to rid the site of contaminants.

¶ 2 Post trial, Rohm & Haas' request for judgment *non obstante veredicto* (JNOV) was granted by the court, which, of course, negated the jury's verdict. The case proceeded to a non-jury damages trial, at the conclusion of which the court entered judgment in favor of Rohm & Haas and against the insurers in the aggregate amount of $21,031,352.00. The insurers' consolidated appeals therefrom are now before us and require us to determine, among other things, whether the court erred when it granted Rohm & Haas' motion for JNOV. After careful review, we are persuaded that the court improperly granted the motion.[1] Thus, we vacate the court's order of JNOV, reinstate the jury's verdict and remand for entry of judgment on the verdict.

¶ 3 The facts, as gleaned from the record, reveal that on June 30, 1964, Whitmoyer Laboratories, Inc., a veterinary feedstock and pharmaceutical company located in Myerstown, Lebanon County, Pennsylvania, was purchased by and thereafter operated as a going concern by Rohm & Haas. Very shortly after acquiring Whitmoyer, Rohm & Haas became aware that Whitmoyer posed a serious environmental pollution problem. Specifically, within weeks after purchase, Rohm & Haas learned that huge amounts of arsenic waste generated by Whitmoyer had been dumped on-site since 1957, resulting in a serious contamination of the surrounding soil and groundwater as well as the waters of nearby Tulpehocken Creek.

¶ 4 Tests conducted by Rohm & Haas in September of 1964 on water samples collected from five separate wells on the Whitmoyer site revealed respective arsenic levels of 11,100 parts per million (ppm); 10,600 ppm; 9,400 ppm; 8,500 ppm; and 4,500 ppm.[2] By October 16, 1964, Rohm & Haas became concerned about the possible arsenic contamination of water in off-site wells located in the vicinity of Whitmoyer. Thus, on November 2, 1964, Rohm & Haas took a water sample from a neighboring family's well. When the test showed a concentration of arsenic greater than 10,-

---

1. The trial included issues related to Rohm & Haas property in Bristol, Pennsylvania. There are no issues on this aspect of the case before us.

2. At the time, the U.S. Public Health Service's limit for arsenic in drinking water was .05 ppm. Thus, the samples obtained at the Whitmoyer site were vastly more contaminated than the permitted safe level.

000 ppm, Rohm & Haas advised the family to inactivate their well and secure it against use until further notice. Because several members of the neighboring family had recently fallen ill, Rohm & Haas paid their medical bills in "full settlement all claims in connection with the contamination of your well water and illness which may have resulted therefrom." In all, by early 1965, some 30 private wells in the vicinity of Whitmoyer were determined to be contaminated with arsenic and Rohm & Haas began supplying bottled water to the well owners. In sum, the pollution problem at Whitmoyer was serious and pervasive, a fact which must have been known to the management of Rohm & Haas in 1964.

¶ 5 On December 28, 1964, Rohm & Haas added the Whitmoyer site under three existing excess liability policies it had with the appellant London Insurers.[3] The site was added to the existing policies retroactive to the date Rohm & Haas acquired Whitmoyer, i.e., June 30, 1964. The London Insurers' underwriters noted "no known losses up to 19 November[, 1964]," on the endorsement which added Whitmoyer to the existing policies.

¶ 6 In cooperation with the Pennsylvania Department of Health (PaDOH) and, later, the Pennsylvania Department of Environmental Resources (PaDER), Rohm & Haas initiated an extensive clean-up effort in January of 1965, which continued until 1971. The effort was discontinued at that time, reportedly because a point of diminishing returns had been reached. That is, although the overall level of arsenic contamination had been decreased, further treatment of the residual level of pollution would yield no better results than no treatment at all. Nonetheless, with the exception of a three month period at the beginning of 1965, during the entire period Rohm & Haas owned and operated Whitmoyer (1964 through 1978), Rohm & Haas continued to generate and dump arsenic waste as a result of its manufacturing pro-

cess and in 1978, bottled water was still being provided to 10 neighboring residences.

¶ 7 During the period of time when Rohm & Haas' remedial efforts were underway and its awareness of the scope of the contamination continued to increase, Rohm & Haas periodically purchased further excess liability insurance from the London Insurers and other appellant insurance companies herein without informing the various insurers that the site posed a serious environmental pollution problem. Each of the excess policies contained a "notice" provision requiring Rohm & Haas to immediately notify the insurer of any loss, occurrence or claim against the policy. Although Rohm & Haas continued to "pump and treat" its arsenical waste generated at the Whitmoyer site, and although the management at Rohm & Haas was apparently concerned, as evidenced by internal memoranda produced at trial, about its potential legal liability regarding the site, it appears that no claims under the excess liability policies were made during the time Rohm & Haas owned Whitmoyer. In 1978, Rohm & Haas sold Whitmoyer to Smith–Kline Beecham.

¶ 8 In 1980, Congress enacted the Comprehensive Environmental Response and Liability Act (CERCLA) which imposes strict liability for the clean-up costs of hazardous substances upon the owner or operator of any facility which disposes of such substances. In 1986, Rohm & Haas was advised that it was potentially liable for costs associated with further clean-up of Whitmoyer under the new, more stringent environmental standards set forth by CERCLA. Subsequently, the EPA determined that Rohm & Haas was, in fact, strictly liable for further clean-up costs.

¶ 9 Thus, in 1988, Rohm & Haas first sought coverage from its excess insurers for the costs associated with further clean-up of Whitmoyer. When Rohm & Haas'

---

**3.** The three existing excess liability policies were purchased prior to the date Rohm & Haas acquired Whitmoyer. Two were purchased on January 1, 1962, and one on May 1, 1964.

claims for excess liability coverage under the policies were denied, Rohm & Haas brought suit. The parties agreed to bifurcate the "coverage" trial from any subsequent damages trial. It was agreed that the coverage trial would be before a jury and damages, if any, before a court nonjury.

¶ 10 The coverage trial commenced in the Court of Common Pleas of Philadelphia County before the Honorable Paul L. Jaffe and a jury. During the trial, which lasted nine and one-half weeks, the deposition testimony of Peter Wilson, one of the policy underwriters who handled Rohm & Haas' initial application to add Whitmoyer to its existing excess liability policies was read into the record. Mr. Wilson testified, *inter alia*, that "Rohm & Haas did not disclose ... material information to underwriters and particularly to myself at the time of being asked to consider providing coverage for the Whitmoyer [site]." He further testified that the material information which Rohm & Haas failed to disclose was "that the Whitmoyer company had polluted areas of groundwater which resulted in third-parties bringing claims against the Whitmoyer company. In response to those claims, in addition to payments to third-parties, they were also providing third-parties with an alternative water supply to replace the water."

¶ 11 At the close of all evidence, the court directed a verdict in favor of Rohm & Haas on the insurers' "late disclosure" defense, concluding that the insurers were not prejudiced by Rohm & Haas' late disclosure to them of the pollution problem at Whitmoyer.[4] At the trial's conclusion, the jury, however, by answer to special verdict interrogatories, determined, *inter alia,* that no coverage existed under the policies because Rohm & Haas, at the time it applied for coverage, was aware of the serious pollution problem at Whitmoyer yet failed to disclose the existence of the

problem to the insurers. Specifically, the jury determined:

> *by answer to Jury Verdict Question No. 7:* That Rohm & Haas failed to disclose material facts about the arsenic pollution problem at Whitmoyer when it purchased the excess policies;

> *by answer to Jury Verdict Question No. 3:* That at the time it contracted with the excess liability insurers, Rohm & Haas knew of damage or injury for which there would be legal liability large enough to reach the excess policies;

> *by answer to Jury Verdict Question No. 2:* That after purchasing Whitmoyer, Rohm & Haas proceeded to act despite the substantial certainty that damage such as that which occurred would result during the policy periods in question; and

> *by answer to Jury Question No. 4:* That Rohm & Haas' initial awareness that its resultant damages would exceed its underlying coverage and reach its excess insurance policies occurred sometime before March 1, 1965.

¶ 12 After the jury returned its verdict, the individual jurors returned to the jury room. The trial judge joined them there and, as alleged in the sworn affidavits of two of the jurors present, the judge told the jurors:

a) that he had seen evidence that the jury had not seen and that the jury would have returned a different verdict if it had seen that evidence;

b) that the jury made the wrong decision in its verdict;

c) that the insurance companies had recently lost another case in Pittsburgh;

d) that Rohm & Haas is a very good company;

e) that the existence of old company records from so far back in time proved that Rohm & Haas had nothing to hide;

---

4. Thus, it was decided that there was no prejudice in delaying notice of the environmental pollution problem from 1964 to 1988.

f) that Rohm & Haas has sites all over the country that will cost them billions of dollars to settle; and

g) that the jury should have noticed that Travelers and Aetna had settled with Rohm & Haas.

One of the jurors reported "I then asked [the judge] how His Honor could be so biased when I thought a judge was to be impartial, to which [the judge] responded that he was only human."

¶ 13 The parties filed post-verdict motions and on June 6, 1997, appellant insurers filed a motion seeking the trial judge's recusal from ruling on those motions and from presiding over the damages trial. There was no hearing on the recusal motion. On July 15, 1997, at the outset of the hearing on the post-verdict motions of the parties, the trial judge summarily denied the recusal motion, stating from the bench, "[i]n the meantime before we proceed, I wish to indicate to everyone here that the motion for my recusal is hereby denied." The court's opinion in support of its denial of the recusal motion was not filed until December 19, 1997, some five months later. In that opinion, the court supported its denial of the recusal motion, in part because "the comments made by the jurors in their affidavit[s] do not accurately reflect the conversation that this court had with the jurors after the verdict was reached."

¶ 14 By order dated July 21, 1997, the court entered JNOV on the jury's verdict with respect to the jury's answers to verdict questions numbers 7 and 3. The order further mandated that the jury's verdict in response to verdict questions numbers 2 and 4 did not preclude coverage for that portion of the environmental damage caused by Whitmoyer's actions before it was acquired by Rohm & Haas.

¶ 15 The court ordered the commencement of the non-jury damages trial. At the conclusion thereof, the court granted the following relief:

a) Judgment in favor of Rohm & Haas, and against the London Insurers, in the amount of $14,343,455.00 for past clean-up costs; $1,754,456.00 for past defense costs;[5] $2,743,342.00 for prejudgment interest and a percentage of Rohm & Haas' future clean-up and defense costs.

b) Judgment in favor of Rohm & Haas, and against the Home Insurance Company, in the amount of $1,500,000.00 for past clean-up costs; $204,544.00 for past defense costs; $485,555.00 for prejudgment interest and a percentage of Rohm & Haas' future clean-up and defense costs.

¶ 16 The London Insurers and The Home Insurance Company filed separate appeals which have been consolidated herein. Rohm & Haas filed a cross-appeal which was subsequently discontinued. United Policy Holders and Bethlehem Steel Corp., *et al.*, have filed amicus briefs in support of appellee Rohm & Haas. The Environmental Litigation Association has filed an amicus brief in support of appellant insurers.

¶ 17 Before us are the following issues: 1) Whether the trial judge should have recused himself from ruling on the post-trial motions and presiding over the damages trial because of his biased statements in favor of [Rohm & Haas] which were based on matters a fact-finder may not consider; and whether the trial judge further erred in failing to refer the recusal motion to another judge for disposition.

2) Whether the trial court erred in overturning the jury's verdict in favor of Defendant Insurers on Jury Question No. 7 (failure to disclose issue) and, if not, whether the standards set forth in that question and the corresponding jury instructions were improper.

3) Whether the trial court erred in overturning the jury's verdict in favor of Defendant Insurers on Jury Question

**5.** Rohm & Haas was a defendant in three separate actions involving Whitmoyer prior to being a plaintiff in the present action.

No. 3 (known loss issue) and, if not, whether the standards set forth in that question and the corresponding jury instructions were improper.

4) Whether the trial court erred in holding that, notwithstanding the jury's verdict in favor of the Defendant Insurers on Jury Question No. 2 (expected damage issue), Defendant Insurers were still obligated to pay for all the damages caused by [Rohm & Haas'] direct corporate predecessor.

5) Whether the trial court erred in ruling that the jury's verdict in favor of Defendant Insurers on Jury Question No. 4 (manifestation issue) had no "legal effect."

6) Whether the trial court erred in directing a verdict in favor of [Rohm & Haas] on the issue of prejudicially late notice.

7) Whether the trial court erred in holding Defendant Insurers liable, up to their respective policy limits, for all the damage caused by the actions of [Rohm & Haas'] direct corporate predecessor prior to the inception of Defendant insurers' coverage.

8) Whether the trial court erred in ordering Defendant Insurers to indemnify [Rohm & Haas] for defense costs and prejudgment interest incurred and/or accrued prior to the date of settlement between [Rohm & Haas] and [its] primary insurer.

9) Whether the trial court erred in holding that [Rohm & Haas] may choose which individual subscribers to the London Insurers' policies will pay the loss.

¶ 18 Appellants first allege that the trial judge erred when he failed to recuse himself from presiding over the post-trial motions and the subsequent damages trial because it is alleged the statements he made to the jurors immediately after trial manifested a personal bias against the insurance companies and in favor of Rohm & Haas. For purposes of this appeal we defer any consideration of this issue since we are able to decide the merits of the appeal without reference to the claim of bias and taint against the trial judge.

¶ 19 Accordingly, we turn our inquiry to a consideration of appellants' second issue: whether the court properly entered JNOV on the jury's verdict that Rohm & Haas failed to disclose material facts about the arsenic pollution problem at Whitmoyer when it purchased the excess coverage in question.

> In reviewing a motion for judgment n.o.v., the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. Moreover, a judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. Further[,] a judge's appraisement of the evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations. There are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Moure v. Raeuchle*, 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992). *Accord Nogowski v. Alemo–Hammad*, 456 Pa.Super. 750, 758–764, 691 A.2d 950, 955–57 (1997) (*en banc* ), *appeal denied*, 550 Pa. 684, 704 A.2d 638 (1997). In making the

determination of whether judgment notwithstanding the verdict is appropriate, our scope of review is plenary as it is with any review of questions of law. *Davis v. Berwind Corp.*, 547 Pa. 260, 266, 690 A.2d 186, 189 (1997). *Boutte v. Seitchik*, 719 A.2d 319, 322–23 (Pa.Super.1998); *See also Petrasovits v. Kleiner*, 719 A.2d 799 (Pa.Super.1998) (JNOV is proper if movant is entitled to judgment as a matter of law or if evidence was such that no two reasonable minds could disagree the verdict was improper); *Clinton v. Giles*, 719 A.2d 314 (Pa.Super.1998) (same).

¶ 20 JNOV is the proper remedy in a civil case where the evidence presented at trial was insufficient to sustain the verdict. *Butler v. Flo–Ron Vending Co.*, 383 Pa.Super. 633, 557 A.2d 730, 735 n. 6 (1989). Nonetheless, JNOV is an extreme remedy which is properly entered by the trial court only in a case where, after viewing the evidence in the light most favorable to the verdict winner, the facts are so clear that no two reasonable minds could fail to agree that the verdict, as rendered by the jury, was improper. *Lilley v. Johns–Manville Corp.*, 408 Pa.Super. 83, 596 A.2d 203, 207 (1991) (citing *Robertson v. Atlantic Richfield Petro.*, 371 Pa.Super. 49, 537 A.2d 814, 819 (1987)). JNOV, however, "may *not* be employed to invade the province of the jury." *Collincini v. Honeywell, Inc.*, 411 Pa.Super. 166, 601 A.2d 292, 294 (1991) (citing *Trawick v. Nationwide Mutual Insurance Co.*, 242 Pa.Super. 271, 363 A.2d 1265 (1976)). Thus, when there is a question of fact to be resolved, it is within the sole purview of the jury. *Id.* JNOV should not be entered where evidence is conflicting upon a material fact. *Lilley v. Johns–Manville Corp.*, 596 A.2d at 207. Thus, where the jury has been presented with conflicting evidence, a motion for JNOV should be denied. *USF & G v. Royer Garden Center*, 143 Pa.Cmwlth. 31, 598 A.2d 583 (1991).

¶ 21 In the instant matter, the court entered JNOV on the jury's affirmative answers to special verdict question number 7 wherein the jury concluded that Rohm & Haas failed to disclose material information to the insurers regarding the massive pollution problem at Whitmoyer at the time it applied for the excess policies. The full text of Question No. 7 with the jury's answers thereto is as follows:

Do you find that, as to any of the policies listed below, the insurer issuing the policy has proven the following facts by clear and convincing evidence:

A. That, in connection with buying the specific insurance policy, Rohm and Haas' employees or agents of Rohm and Haas who were in contact with the issuing insurer intentionally failed to disclose material information about Whitmoyer; and, if so,

B. That Rohm and Haas employees or agents deliberately concealed material information with the intent to deceive the CGL excess insurer; or, as part of an intentional plan to conceal and deceive, kept material information from the employees or agents in contact with the insurer so that the information would not be disclosed?

*ANSWER*

A. Three London Policies (June 30, 1964 to March 1, 1965)

[the jury answered "Yes."]

B. London Policy (January 22, 1965 to March 1, 1965)

[the jury answered "Yes."]

C. Two London Policies (March 1, 1965 to March 1, 1968)

[the jury answered "Yes."]

D. Home Policy (March 1, 1968 to March 1, 1971)

[the jury answered "Yes."]

E. American Home Policy (March 1, 1968 to March 1, 1971)

[the jury answered "Yes."]

F. London Policy (March 1, 1968 to March 1, 1971)

[the jury answered "Yes."]

G. Home Policy (March 1, 1969 to March 1, 1971)

[the jury answered "Yes."]

¶ 22 Prior to purchasing Whitmoyer on June 30, 1964, Rohm & Haas had three existing excess liability policies in force with the London Insurers. Two of those policies were purchased on January 1, 1962, and the other was purchased on May 1, 1964. It is undisputed that Rohm & Haas added Whitmoyer under those policies in December of 1964, retroactive to June 30, 1964. The court considered the jury's verdict on question number 7 in light of these facts and the jury's explicit finding, in special verdict question number 5, that prior to its acquisition of Whitmoyer on June 30, 1964, Rohm & Haas was unaware of any pollution problem at the site.[6] The court concluded that Rohm & Haas could not have had any intent to deceive or conceal material information when it purchased its initial policies for excess liability insurance in January of 1962 and May of 1964, because at that time, although Rohm & Haas was engaged in negotiations to purchase Whitmoyer, Rohm & Haas was not aware that Whitmoyer presented a serious environmental pollution problem. The court, therefore, entered JNOV on the jury's verdict with respect to the three London policies to which Whitmoyer was added because it determined

[t]hat the appropriate time reference in question No. 7 is that of the actual date Rohm and Haas contracted for each policy and not the date in which London agreed to issue an endorsement covering Whitmoyer under the London insurer's [sic] previously issued policies.

[U]pon review of the evidence presented to the jury, it is clear that there has been no showing by clear and convincing evidence that at the time these three London policies were contracted for, Rohm and Haas made any intention-

al omissions of material information concerning the Whitmoyer site.

¶ 23 We find the court's interpretation flawed for several reasons. First, the court clearly interpreted question number 7 as referring to policy dates which did not appear within the actual, literal text of the question presented to the jury. The court found that the "relevant time period referred to . . . is the actual inception date of the 1962/1964 policies, i.e., January 1, 1962 and May 1, 1964." Thus, the court chose to elect the historical inception date of insurance rather than the critical date when the Whitmoyer risk was added. Question number 7, in fact, specifically asked whether Rohm & Haas withheld material information with respect to the "Three London Policies (*June 30, 1964 to March 1, 1965*)." (Emphasis added). Thus, question number 7 asked the jury to determine whether Rohm & Haas withheld material information when, in late 1964, it added Whitmoyer to its existing policies, retroactive to June 30, 1964.

¶ 24 Further, question number 7 did not inquire about any policy inception dates prior to June 30, 1964. In fact, the dates January 1, 1962, and May 1, 1964, do not appear anywhere in question number 7. It is clear that the jury was not being asked whether Rohm & Haas withheld material information when it initially purchased excess policies in January of 1962 and May of 1964, prior to its purchase of Whitmoyer. Thus, the court's conclusion that "the evidence does not support the jury's finding on Question No. 7 with respect to the 1962/1964 London policies and an Order of N.O.V. is entered with respect to those policies[,]" is error, in part, because question number 7 simply did not refer to the policy dates imputed as "relevant" by the court and a review of the record reveals there was no factual dispute at trial re-

6. Question number five and the jury's answer thereto read as follows:

Have the insurers proven that, before Rohm and Haas bought Whitmoyer on June 30, 1964, Rohm and Haas' executives or super- visory employees had actual knowledge that the waste disposal practices of Old Whitmoyer had caused and were causing injury to groundwater at the Whitmoyer site? The jury answered "No."

garding which policy dates were relevant. Indeed, the theory that there were two relevant "levels" of excess liability coverage; i.e., one level which pre-dated Rohm & Haas' acquisition of Whitmoyer under policies issued in January of 1962 and May of 1964, and a second level which included all other coverage incepting after June 30, 1964, was first proposed by Rohm & Haas in its post-trial motions for relief. The court apparently adopted Rohm & Haas' proposed theory in ruling on Rohm & Haas' motion for JNOV.

¶ 25 Second, the court's rationale for interpreting jury question number 7 as referring to policy dates not included in the literal text of the question is strained and appears to focus on the issue of potential damages rather than the issue of coverage. The court concluded, with respect to the three London policies to which Whitmoyer was added, that the policy inception dates of January 1, 1962, and May 1, 1964, should be imputed, seemingly as a matter of law, because "Rohm and Haas is seeking coverage for its *own liability* under CERCLA for the remediation of the contamination at the Whitmoyer site and not for liability relating to when Whitmoyer Labs became a named assured under the London's policies." (Emphasis added). While Rohm & Haas was indeed insuring itself as an entity, the trial court confused Rohm & Haas without Whitmoyer as an entity with the patently riskier Rohm & Haas with Whitmoyer.

■ ¶ 26 It is undisputed that some portion of the damages for which Rohm & Haas was strictly liable under CERCLA was necessarily caused by arsenic contamination which occurred at Whitmoyer prior to Rohm & Haas' acquisition of the facility. In fact, Whitmoyer was already severely polluted from the first day Rohm & Haas owned it. It is equally undisputed that Rohm & Haas had excess liability policies in force before it owned Whitmoyer. However, Rohm & Haas' strict liability for the clean-up of Whitmoyer under federal law arose out of Rohm & Haas' status as an "owner and operator" of the Whitmoyer site. *See* 42 U.S.C. § 9607. That status did not come into being until June 30, 1964, the date Whitmoyer became a wholly owned subsidiary of Rohm & Haas. Thus, we conclude that the three policies for excess liability insurance in force prior to that date cannot serve to indemnify Rohm and Haas against damages arising out of Whitmoyer's actions which occurred before June 30, 1964, because prior to that date, Rohm & Haas did not "own or operate" the site. Similarly, we conclude that the only relevant date for purposes of the pre-existing policies is June 30, 1964, as that is the date Whitmoyer was added to the pre-existing policies and, thus, was the date those policies began covering Rohm & Haas for any potential damages which might flow from the Whitmoyer environmental catastrophe. The fact that governmental authorities elected to impose full environmental responsibilities on Rohm & Haas, does not *ipso facto* grant to Rohm & Haas as the insured the privilege of asserting retroactive coverage rights on an uninformed insurer.

■ ¶ 27 Finally, after a careful review of the voluminous record in this matter, we conclude that ample evidence existed for the jury to find that Rohm & Haas failed to disclose material information regarding the serious environmental problems of which it was aware when it added Whitmoyer under its three London policies retroactive to June 30, 1964. It has long been the law of this Commonwealth that it is the duty of an applicant for insurance to make full disclosure of all things material to the risk. *American Union Life Ins. Co. v. Judge*, 191 Pa. 484, 43 A. 374 (1899); *Smith v. Northwestern Mut. Life Ins. Co.*, 196 Pa. 314, 46 A. 426 (1900). Information withheld is material for purposes of allowing an insurer to rescind a policy if the information, if given, would have influenced the judgment of the insurer in issuing the policy, in estimating the degree and character of the risk, or in fixing a premium rate. *A.G. Allebach, Inc. v. Hurley*, 373 Pa.Super. 41, 540 A.2d 289 (1988).

In the instant matter, evidence was presented at trial regarding the serious and pervasive nature of the contamination. It was uncontroverted that Rohm & Haas was aware of the problem within weeks of its purchase of the site. Evidence was also presented which showed that Rohm & Haas failed to disclose the pollution problem to the London Insurers when it added Whitmoyer to its existing excess policies. Moreover, evidence was presented that the undisclosed information was material to the risk for which coverage was sought. Thus, we conclude that the court erred when it entered JNOV with respect to the jury's answer to verdict question number 7 as it related to the "Three London Policies."

¶ 28 The court also entered JNOV on jury verdict question number 7 with respect to all policies which the court characterized as "level two" coverage; i.e., "post-acquisition policies" which incepted after June 30, 1964.[7] It was undisputed that the Whitmoyer contamination was not disclosed when these policies were purchased. Nonetheless, the court entered an order of JNOV on the jury's affirmative answers to verdict question number 7 regarding the "post-acquisition" policies on the basis that the evidence presented at trial was insufficient for the jury to properly find a deliberate, fraudulent "intent to deceive" on the part of Rohm & Haas when it purchased the policies. We disagree.

¶ 29 Conflicting evidence was presented with respect to this issue at trial. The insurers presented evidence which tended to show that as Rohm & Haas became increasingly aware of the contamination at Whitmoyer and the possible legal consequences which might flow therefrom, it increased its amount of excess liability coverage without disclosure to its insurers of its knowledge and concerns regarding Whitmoyer. On the other hand, Rohm & Haas presented evidence which tended to show that it was cooperating fully with the PaDOH and the PaDER in remediating the contamination at Whitmoyer and bought increased excess liability insurance for reasons entirely unrelated to any concern it may have had regarding possible damages it might incur due to the Whitmoyer contamination.[8]

¶ 30 It is well established that "where the execution of a contract of insurance has been induced by fraudulent misrepresentations of the insured, the insurer may secure its cancellation[.]" *Tudor Ins. Co. v. Township of Stowe*, 697 A.2d 1010 (Pa.Super.1997) (quoting *New York Life Insurance Co. v. Brandwene*, 316 Pa. 218, 221, 172 A. 669, 669 (1934)). The burden of proving fraud is on the insurer who must prove, by clear and convincing evidence, that on the application, the insured knowingly made false statements or knowingly failed to disclose information which was material to the risk against which the insured sought to be protected. *Id.* at 1016. In order to show a policy is void *ab initio* on the basis of fraud, the insurer must prove that the

---

**7.** The record discloses that Rohm & Haas made the following purchases of excess liability coverage after June 30, 1964:

July 16, 1964—$5,000,000.00 from Travelers; January 22, 1965—$3,000,000.00 from the London Insurers; March 1, 1965—$10,500,000.00 from the London Insurers; March 1, 1966—$15,000,000.00 total from Travelers, Aetna, Continental Casualty, American Re-Insurance and General Re-Insurance Corp.; March 1, 1968 – $21,600,000.00 from the London Insurers, $5,400,000.00 from Employers' Liability Assurance, $4,000,000.00 from American Home, $2,000,000.00 from Fireman's Fund and $1,500,000.00 from The Home; March 1, 1969—$14,000,000.00 total from North Star Re-Insurance, Aetna, American Casualty, Fireman's Fund, Travelers and American Re-Insurance; $1,000,000.00 from The Home.

The only policies at issue for purposes of jury verdict question number 7 were those issued by the London Insurers, American Home and The Home.

**8.** At trial, Henry Taylor, who worked in Rohm & Haas' insurance department for over thirty years and whose responsibility was, *inter alia*, to purchase excess insurance, testified that he recommended the purchase of greater levels of excess insurance in the 1960s because the insurance was inexpensive to acquire and Rohm & Haas was a growing company.

intent to deceive was deliberate. *Grimes v. Prudential Ins. Co. of America*, 401 Pa.Super. 245, 585 A.2d 29, 33 (1991).

Mere mistakes, inadvertently made, even though of material matters, or the failure to furnish all details asked for, where it appears that there is no intention of concealing the truth, does not work a forfeiture, and a forfeiture does not follow where there has been no deliberate intent to deceive, and the known falsity of the answer is not affirmatively shown.

*Id.* (quoting *Evans v. Penn Mutual Life Insurance Co.*, 322 Pa. 547, 553, 186 A. 133, 143 (1936)). The clear and convincing standard of proof is sufficiently met if the evidence presented was "so clear, direct, weighty, and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Lessner v. Rubinson*, 527 Pa. 393, 400, 592 A.2d 678, 681 (1991). Nonetheless, "fraud ... is never proclaimed from the housetops nor is it done otherwise than surreptitiously with every effort to conceal the truth of what is being done. So fraud can rarely if ever be shown by direct proof. It must necessarily be largely inferred from the surrounding circumstances." *Shechter v. Shechter*, 366 Pa. 30, 33, 76 A.2d 753, 755 (1950). In the instant matter, the court granted JNOV because it determined that the jury could not have permissibly inferred a fraudulent intent to deceive from the evidence presented at trial.

¶ 31 At trial, the insurers presented evidence of a chronology of events which showed that Rohm & Haas' purchases of additional excess insurance grew as evidence of the magnitude of the contamination became obvious, as did the manifest assurance of massive exposure to liability. Moreover, evidence was presented that on January 6, 1965, associate general counsel and secretary for Rohm & Haas, F.J. Rar-

ig, drafted a memorandum to, among others, Rohm & Haas' chairman, Otto Haas, its executive vice president, Louis Klein and its general counsel, Fay Hall. The memorandum was classified "company confidential" and in pertinent part read, "[w]e must under no circumstances make statements to the press regarding the presence of arsenical compounds in Tulpehocken Creek, the Schuylkill River, or any public water supplies. Any inquiry regarding the presence of these compounds in these areas is to be referred to the State [PaDOH]." Two days later, On January 8, 1965, a memo was sent by Rohm & Haas to the PaDOH which conceded that an "emergency" existed at Whitmoyer, but which maintained that "[t]he degree of emergency, of course, is a question for you to determine." Three days later, on January 11, 1965, F.J. Rarig sent correspondence to the Director of Sanitary Engineering at PaDOH thanking him "for the time which you and your staff devoted to making possible our confidential disclosures regarding the waste disposal problem at ... Whitmoyer[.]" On January 22, 1965, Tom Iezzi, Rohm & Haas' chief waste disposal engineer, drafted a memorandum to F.J. Rarig which listed the neighbors who had been "notified concerning contamination of their well water supply." The memorandum went on to opine that one of the reasons bottled water was being supplied to the neighbors was to "minimize possible legal action against us." That same date, Rohm & Haas purchased $3,000,000.00 additional excess liability insurance from the London Insurers without informing them of the Whitmoyer contamination. Evidence was also presented with respect to Rohm & Haas' generally increasing awareness of the scope of the contamination and its subsequent purchases of increasing levels of excess liability insurance in the years 1966 through 1969.[9] The insurers argued to the jury

9. For example, on March 1, 1968, Rohm & Haas purchased an additional $21.6 million in excess liability insurance from the London Insurers, $8 million from American Home and $4.5 million from The Home. Later that month, on March 19, 1968, Rohm & Haas submitted an application to the Commonwealth of Pennsylvania, Sanitary Water Board, seeking permission to discharge arsenic laden water directly into the Tulpehocken

that fraud on the part of Rohm & Haas could be inferred from Rohm & Haas' conduct in purchasing increasing amounts of excess insurance while initially trying to "keep quiet" about the Whitmoyer environmental emergency/health hazard and without ever informing the excess insurers of the contamination problem.[10]

¶ 32 On the other hand, Henry Taylor testified for Rohm & Haas that the Whitmoyer contamination was not a consideration in Rohm & Haas' decision to purchase greater levels of excess insurance. He testified the insurance was purchased because it was inexpensive and because Rohm and Haas was growing rapidly during the decade of the 1960s as follows:

Q. As a result of that growth, Mr. Taylor, did you make any recommendations or suggestions to management?

A. Yes, we did. We recommended that the insurance be purchased to provide higher limits of liability to protect the company's assets.

Q. Were your suggestions approved?

A. Yes.

Q. Now, are you familiar with an acquisition that Rohm and Haas made in 1964 of Whitmoyer Laboratories?

A. Yes.

Q. What impact, if any, did that acquisition have on suggestions that you were making to purchase additional excess coverage?

A. No impact.

Q. Why not?

A. They were a very small company compared to the overall size of Rohm and Haas. Its sales were something less than $10 million a year and Rohm and Haas was up in the hundreds of millions.

Q. Some of the insurance companies have suggested that you went out and specifically bought more insurance because you knew about a problem at Whitmoyer; is that true?

A. That is not true.

¶ 33 Apparently, during the 1960s, excess insurance, even in coverage amounts of millions of dollars, was available for purchase rather informally. Taylor testified that during those years Rohm & Haas was not required to fill out any application or questionnaire in connection with the purchase and that no representative of the insurer inspected the insured site. Moreover, Taylor testified that he was personally unaware of any problem at Whitmoyer until early 1965 and even then, he thought the problem was under control. Thus, Rohm & Haas argued to the jury that any misrepresentation was innocent and that fraud was not a proper inference under the facts, an argument which the jury apparently rejected.

¶ 34 The court explained its reasoning for ordering JNOV on the jury's verdict with respect to this issue as follows:

The critical issue in the instant matter is whether it was a permissible inference for the jury to find, based on the evidence presented, that the Rohm and

---

Creek. The application estimated that 100,-000 pounds of arsenic "remain in the soil and rock underlay" at Whitmoyer. The application, *inter alia*, set forth:

We request permission to discharge the recovered well water ... because we [have] a tremendous interest in achieving definitive control of the existing health hazard which may pose a continuing threat of unknown dimensions for an indefinite time if a program such as [that] proposed is not put into effect.

10. The record shows that on January 26, 1965, Rohm & Haas contacted its primary liability insurance carrier regarding the Whit-

moyer site. The first paragraph of that correspondence, authored by Lyle Morgan, Rohm & Haas' director of insurance, sets forth the following:

On January 8 when our Whitmoyer officials were notifying the Pennsylvania Department of Health, I verbally reported to you the information being submitted; and you kindly consented to a brief letter of confirmation as meeting the notice requirement under the contract. As explained to you, any premature disclosure of information might have precipitated unwarranted claims; and we did not want the insurance channels questioned as a possible source of information leak.

Haas executives responsible for purchasing additional insurance coverage deliberately acted to withhold material information about Whitmoyer from the defendant insurers. Or that other persons at Rohm and Haas as part of a plan kept material information from the employees and agents in contact with the insurers. While this Court recognizes that a jury is permitted to infer an "intent to deceive" from circumstantial evidence, the evidence in the instant matter fails to show under the clear and convincing standard an intentional plan to deceive. Rather, the circumstantial evidence presented supports mere speculation that Rohm and Haas executives or supervisory personnel responsible for purchasing additional insurance coverage had a plan to deliberately withhold material information concerning the problems at Whitmoyer from the insurers. As stated in *Smith* [*v. Bell Tel. Co. of Pa.*, 397 Pa. 134, 139, 153 A.2d 477, 479 (1959),] "the jury may not be permitted to reach its verdict merely on the basis of speculation and conjecture, but there must be evidence upon which logically its conclusion may be based."

¶ 35 The court explained that the insurers presented a chronology of events which showed that Rohm & Haas' purchases of excess insurance often followed on the heels of its increased awareness of the pollution problem at Whitmoyer. The court reasoned that the jury impermissibly applied the logical fallacy of *"post hoc ergo propter hoc* (after this and therefore in consequence of this)" in reaching its verdict. Thus, the court granted JNOV, in part because "for the jury to determine a causal connection exists between the two events merely because one follows the other and conclude therefrom that [Rohm & Haas] intended to deceive the insurers amounts to an impermissible inference."

¶ 36 After a careful review of the record, we must disagree. The record shows that, in addition to presenting a chronology temporally tying Rohm & Haas' purchases of insurance to its increased awareness of the pollution problem, the insurers also produced evidence which tended to show that Rohm & Haas initially hoped to keep the problem from being reported in the press, in part because it was concerned that any publicity regarding the problem published before an official release by the PaDOH might lead to "unwarranted" claims for damages being brought against Rohm & Haas. Further, Rohm & Haas supplied bottled water to the owners of neighboring wells in effort to thwart "possible legal action against us and all its nasty implications." With respect to Mr. Taylor's involvement with the purchase of insurance, it was shown at trial that Lyle Morgan, the head of Rohm & Haas' insurance department during the relevant time frame, was "privy to information in the corporate hierarchy of Rohm and Haas that [Mr. Taylor was] not necessarily privy to[,]" and that the ultimate decision whether to purchase further insurance was "corporate."

¶ 37 We reiterate that in considering a motion for JNOV, a court must view the evidence and all reasonable inferences arising therefrom in the light most favorable to the verdict winner. *Boutte v. Seitchik*, 719 A.2d at 322. JNOV, an extraordinary remedy, is only appropriately entered for insufficiency of supporting evidence when no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *Id.* Under this standard of review, we are persuaded that the court erred when it ordered JNOV on the jury's affirmative answers to special verdict question number 7.

¶ 38 Significant to our analysis is that 1) Rohm & Haas' non-disclosure in this matter was undisputed; and 2) Rohm and Haas' awareness of the problem at all relevant times was undisputed. We recognize that mere mistakes, inadvertently made, even of material information, cannot work to void a contract of insurance if there was no deliberate intent to deceive. *Grimes v. Prudential*, 585 A.2d at 33. This is not a case, however, where Rohm

& Haas' innocence shone forth like a beacon.

¶ 39 In *Grimes* we reversed an order of summary judgment entered in favor of the insurer where the insured failed to fully disclose her medical history in an application for life insurance. We held:

There is no evidence in the record before us that Pauline Grimes was ever aware of a fatty infiltration of her liver. Although a slight elevation in liver enzymes was disclosed by diagnostic tests performed in 1982, the patient was told the results were normal. Therefore, it cannot be said on the basis of the present record that the applicant fully understood she was suffering from a liver abnormality or that when she applied for life insurance four years later she intentionally sought to conceal this portion of her medical history from the insurer. ... In this case, it will be for a jury to decide on the basis of all the evidence whether Pauline Grimes answered the questions on the application with knowledge that her responses were false or incomplete or whether the incomplete narration of her medical history was unintentional and inadvertent.

*Id.*

¶ 40 In the instant matter, unlike the circumstances in *Grimes*, Rohm & Haas admittedly knew that Whitmoyer posed serious environmental and public health concerns and it is clear that such information was material to the risk for which coverage was sought under the excess policies in question. Yet, for whatever reason, Rohm & Haas failed to disclose this information to its excess insurers. The jury apparently concluded on the basis of the evidence presented at trial that Rohm & Haas' failure to disclose was not merely inadvertent, but was knowing. The jury correctly concluded that the corporate enterprise infected with the incriminating knowledge, could not be heard to construct a wall of obliviousness around its department charged with conducting insurance affairs. Circumstantial evidence was presented which would support such a

conclusion. Peter Wilson testified as follows:

I believe that any insured such as Rohm & Haas who had an insurance department with an experienced director or risk manager who is, in turn, assisted by others, plus they were also using the services of two of the largest brokers in the world in the 1970's and 1980's and even in the 1960's [they were] using large, highly respected insurance brokers. I believe that Rohm & Haas and their brokers knew perfectly well what they were expected to disclose to underwriters when obtaining underwriters' support to their insurance proposals.

¶ 41 While the trial court correctly noted that "in the vast amount of documents produced throughout the ... trial, there was not one exhibit introduced into evidence which [directly] demonstrated ... a plan to deceive the ... insurers[,]" we cannot say that the circumstantial evidence presented was insufficient to permit the jury to infer such a plan existed under the clear and convincing standard. Thus, we cannot conclude, as the trial court did, that the evidence was such that no two reasonable minds could differ in determining that Rohm & Haas should have prevailed on the question of its scienter with respect to its admitted non-disclosure of clearly material information. Accordingly, we conclude that the court erred in reversing the jury's verdict with respect to question number 7.

¶ 42 Appellant insurers next allege that the court erred when it entered JNOV with respect to the jury's answer to special verdict interrogatory number 3 which pertained to the insurers "known loss" defense. Question number 3 and the jury's answer thereto read as follows:

Have the insurers proven that, at the time of contracting any of the following CGL excess policies, Rohm & Haas had certain knowledge of damage or injury for which there would be legal liability that was large enough to exceed the underlying insurance layers and would

reach the excess layer of any of the following CGL excess policies?

A. London Policy (June 30, 1964 to March 1, 1965) providing coverage in excess of $500,000 of underlying coverage[: the jury answered "Yes."].

B. London Policy (June 30, 1964 to March 1, 1965) providing coverage beginning in excess of $1.5 million of underlying coverage[: the jury answered "Yes."].

C. London Policy (January 22, 1965 to March 1, 1965) providing coverage beginning in excess of $5 million of underlying coverage[: the jury answered "Yes."].

D. London Policy (June 30, 1964 to March 1, 1965) providing coverage beginning in excess of $10 million of underlying coverage[: the jury answered "Yes."].

E. London Policy (March 1, 1965 to March 1, 1968) providing coverage beginning in excess of $500,000 of underlying coverage[: the jury answered "Yes."].

F. London Policy (March 1, 1965 to March 1, 1968) providing coverage beginning in excess of $2 million of underlying coverage[: the jury answered "Yes."].

G. Home Policy (March 1, 1968 to March 1, 1971) providing coverage beginning in excess of $500,000 of underlying coverage[: the jury answered "Yes."].

H. American Home Policy (March 1, 1968 to March 1, 1971) providing coverage beginning in excess of $4 million of underlying coverage[: the jury answered "Yes."].

I. London Policy (March 1, 1968 to March 1, 1971) providing coverage beginning in excess of $8 million of underlying coverage[: the jury answered "Yes."].

J. Home Policy (March 1, 1969 to March 1, 1971) providing coverage beginning in excess of $40 million of underlying coverage[: the jury answered "Yes."].

¶ 43 "The 'known loss' doctrine has not been tested in the state courts of Pennsylvania, and this defense has been recognized to different extents by the courts of other states." *UTI Corp. v. Fireman's Fund Ins. Co.*, 896 F.Supp. 362, 375 (D.N.J.1995). The United States Third Circuit Court of Appeals has described the doctrine as follows:

The known loss doctrine is a common law concept that derives from the fundamental requirement of fortuity in insurance law. Essentially, the doctrine provides that one may not obtain insurance for a loss that either has already taken place or is in progress. *See generally* 12 John A. & Jean Appleman, Insurance Law & Practice § 7001 (rev.ed.1981). As we have recognized, "[t]he rule is based on the realization that the purpose of insurance is to protect insureds against unknown risks." *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 63 (3d Cir.1982) (citations omitted). State courts are divided as to the scope of the known loss doctrine. Some have construed it quite narrowly, barring coverage only when the insured knew of certainty of damages and liability. *See Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, 906 (1995) (*en banc*) ("[A]s long as there remains uncertainty about damage or injury that may occur during the policy period and the imposition of liability ... and no legal obligation to pay third party claims has been established, there is a potentially insurable risk...."). Others have refused to find coverage when the insured was substantially aware of a risk of loss. *See Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 697, 607 N.E.2d 1204, 1210 (1992) ("If the insured knows or has reason to know, when it purchases a CGL policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss.").

*Pittston Co. Ultramar America Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, 517 (3d Cir.1997) (footnote omitted).

¶ 44 In the instant matter, the insurers argue that the jury's affirmative answers to question number 3 determined the "known loss" doctrine worked to preclude coverage under the policies in question because Rohm & Haas had "certain knowledge" that it would incur legal liability large enough to reach the policies at the time it contracted for them. In entering JNOV on the jury's verdict, however, the court determined that insufficient evidence existed to establish the "requisite level of knowledge" on the part of Rohm & Haas to invoke the known loss doctrine as a bar to coverage. The trial court concluded, following the reasoning of the Federal District Court for New Jersey predicting Pennsylvania law in *UTI Corp.*, 896 F.Supp. at 376, that the level of knowledge necessary to invoke the doctrine is not merely an awareness of a substantial probability that liability large enough to reach the excess policies existed at the time of contracting, but rather that there must "exist[ ] certain knowledge of a particular legal liability which would reach the excess layer." The trial court concluded that since no lawsuit for damages existed at the time the policies were contracted for, Rohm & Haas did not have certain knowledge of a particular liability which would reach the excess coverage purchased.

¶ 45 We reiterate that the issue of how broadly or narrowly the known loss doctrine is to be construed is an issue of first impression in the courts of this Commonwealth. Thus, the insurers and their *amici* urge us to a enunciate a broad interpretation which would allow the doctrine's requirements to be satisfied by mere awareness of a substantial probability that liability large enough to reach the excess layers existed at the time of contracting. Rohm & Haas and its *amici*, on the other hand, urge us to interpret the doctrine narrowly, suggesting the doctrine requires that certain knowledge must exist at the time of contracting of a particular legal liability large enough to reach the excess layers.

¶ 46 After careful consideration, and for the reasons which follow, we conclude that the doctrine should be broadly interpreted and that the trial court erred in its application of the doctrine under the facts of this case. First, in entering JNOV on the jury's verdict with respect to the known loss defense, the trial court again incorrectly based its conclusion, in part, upon its misapprehension that the relevant time frames for purposes of deciding the issue were the historical inception dates of the Three London Policies when the question presented to the jury, in fact, referred only to dates coincident or subsequent to Rohm & Haas' acquisition of Whitmoyer. As we have previously concluded, the court's imputation of the earlier dates was error.

¶ 47 Second, in relying on the District Court's holding in *UTI Corp.*, the court apparently failed to consider a significant distinguishing fact. The *UTI Corp.* court explained:

> We must keep in mind, when assessing the "known loss" defense, that it is a defense grounded in policy considerations. *This is not a case in which the insurer has alleged fraud on the part of the insured in the application process.* Rather, in seeking protection through the "known loss" defense, the insurer asks the court to intervene to insulate it from paying claims on the ground that the risk was "uninsurable" at the time the policy of insurance was sold, although the insurer was presumably free to inquire about pollution and other problems of the insured in the course of the application process, and *although there is no allegation that the insured was less than forthcoming during the application process.*

*Id.* 896 F.Supp. 362 at 375. (Emphasis added).

¶ 48 The essential nature of the case *sub judice* centered squarely on allegations of fraud. As we have heretofore explained, sufficient evidence of Rohm &

Haas' fraudulent scienter was shown for the jury to properly find the policies in question were void *ab initio*. We note, moreover, that at least one jurisdiction has found that "known loss," as a fraud-based defense, "requires proof that the insured withheld material information concerning the existence of property damage, including the initiation or continuation of soil or groundwater contamination, for which the insured subsequently obtained insurance." *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 737 (Minn.1997). Under the circumstances here, it is clear that a known loss defense based on allegations of fraud was proven; thus the court erred in its entry of JNOV on the jury's verdict with respect to question number 3.[11]

¶ 49 More importantly, we think that the appropriate standard for the "known loss" defense in Pennsylvania should not be knowledge of certainty of damages and liability, but whether the evidence shows that the insured was charged with knowledge which reasonably shows that it was, or should be, aware of a likely exposure to losses which would reach the level of coverage. It should not be necessary that the insured have already been met with a tabulation of losses sufficient to reach the excess coverage, as that would implicate a standard tantamount to criminal fraud. Rather, when a sophisticated insured, such as Rohm & Haas, is faced with mounting evidence that it will likely incur responsibilities to the extent of the insurance which is sought, the known loss defense should intervene. Otherwise, the issue is one not of insurance, but of pure indemnity.

¶ 50 Here, there was abundant notice to Rohm & Haas that it would inevitably be involved in environmental problems of gigantic proportions due to the arsenical waste problem. Moreover, it is clear Rohm & Haas faced liability under the 1937 Clean Streams Law, 35 P.S. § 691.1 *et seq.*; section 3 of which provided:

The discharge of sewage or industrial waste or any noxious and deleterious substances into the waters of this Commonwealth, which is or may become inimical and injurious to the public health, or to animal or aquatic life, or to the uses of such waters for domestic or industrial consumption, or for recreation, is hereby declared not to be a reasonable or natural use of such water, to be against public policy and to be a public nuisance.

35 P.S. § 691.3.[12] *See also Commonwealth v. Barnes & Tucker Co.*, 455 Pa. 392, 319 A.2d 871 (1974) (section 3 of the Clean Streams Law is merely declaratory of the common law).

¶ 51 In the instant matter, the gross magnitude of the contamination was not challenged at trial. The contamination was "serious" and constituted a public health "emergency." Moreover, Rohm & Haas' awareness of the huge scope of the problem as early as 1964 was conceded and it is clear that Rohm & Haas faced liability for the contamination under the Clean Streams Law. Thus, we conclude

11. The Third Circuit Court of Appeals has recognized that the known loss doctrine has its roots in fraud. *Pittston Co. Ultramar v. Allianz Ins. Co.*, 124 F.3d at 517. In *Pittston*, a case involving environmental pollution, the circuit court predicting New Jersey law narrowly defined the doctrine and concluded that it did not bar coverage as "Ultramar [the insured] did not receive notice of any legal liability until December of 1989, some six years after it purchased the insurance policies." *Id.* at 519. Significant to the court's conclusion was that "the insurers have not alleged that Ultramar misrepresented or wrongfully withheld information regarding the condition of the Tankport site. As such, we hold that Ultramar had a legitimate insurable risk and, thus, coverage is not barred by the doctrine of known loss." *Id.*

12. Section 3 was amended in 1970 to read as follows:

The discharge of sewage or industrial waste or any substance into the waters of this Commonwealth which causes or contributes to pollution as herein defined or creates a danger of such pollution is hereby declared not to be a reasonable or natural use of such waters, to be against public policy and to be a public nuisance.

that Rohm & Haas either knew or should have known at the time it contracted for the excess policies of its likely exposure to liability large enough to reach the policies.

¶ 52 The insurers next allege the court erred when (a) it found that the jury's answers to verdict question number 2 did not preclude coverage for that portion of the environmental damage caused by Whitmoyer's actions before it was acquired by Rohm and Haas; and (b) when it found that the jury's answer to verdict question number 4 had "no legal effect as a defense to coverage under the post-acquisition policies," and "[did] not preclude coverage under the 1962/1964 London policies."

¶ 53 We conclude that these issues are not integral to our disposition of the case and, thus, that a discussion of the issues is not necessary. We would briefly note, however, that the court's interpretation of the jury's answer to verdict question number 2 was inconsistent with its overall disposition of the parties' post-trial motions. In entering JNOV on the jury's answers to verdict questions numbers 7 and 3 and construing the jury's answer to question number 4, the court found that coverage existed under the so-called "post-acquisition" policies. However, the court found that coverage was *precluded* under the post-acquisition policies based on its interpretation of the jury's answer to question number 2. In any event, we are persuaded that the court's interpretation of the import of the jury's answers to verdict questions number 2 and 4 has no dispositional relevance presently as we have reinstated the jury's verdict which properly found that all excess coverage at issue was fraudulently procured.

■ ¶ 54 We will, however, briefly address the insurers' claim that the court erred in directing a verdict in favor of Rohm & Haas on the insurers' "late notice" defense. We conclude that disputed issues of fact existed as to this question and that the resolution thereof should have properly gone to the jury.

¶ 55 It is undisputed that Rohm & Haas first knew of the massive and catastrophic level of arsenic pollution at Whitmoyer in 1964. Rohm & Haas notified the insurers about the problem in 1988, some *24 years later*, despite the following or similar policy provision contained in each of the policies issued:

> Notification of claims—The Assured upon knowledge of any occurrence likely to give rise to a claim hereunder shall give *immediate* written advice thereof to the person(s) or firm named for the purpose in the Schedule. (Emphasis added).

¶ 56 The insurers argued at trial that they were under no duty to indemnify Rohm & Haas under the policies because Rohm & Haas did not give the insurers timely notice of the existence of the Whitmoyer contamination. The court apparently agreed that Rohm & Haas did not, in fact, give timely notice. Nonetheless, the court directed verdict in favor of Rohm & Haas on the insurers' "late notice" defense because it concluded that the insurers failed to present sufficient evidence of how they might have been prejudiced by Rohm & Haas' late notice.

¶ 57 This court has previously stated:

> The purpose of a policy provision requiring notice of an accident or loss to be given within a certain time is to give the insurer an opportunity to acquire, through an adequate investigation, full information about the circumstances of the case, on the basis of which, it can proceed to disposition, either through settlement or defense of the claim.

*Metal Bank of America, Inc. v. Ins. Co. of N. Am.*, 360 Pa.Super. 350, 520 A.2d 493, 497 (1987) (quoting *Brakeman v. Potomac Insurance Co.*, 472 Pa. 66, 74, 371 A.2d 193, 197) (which held that late notice to an insurance company releases the insurer from its obligations under the policy only where the insurer has been prejudiced by the untimely notice)). In *Metal Bank* at 499 n. 4 we explained:

> With respect to prejudice to the insurer the court below very appropriately noted:

It is clear that Metal Bank's late notice to the insurance carrier not only prejudiced the insurance carrier by depriving it of the opportunity to investigate the underlying action, it has also severely prejudiced the insurance carrier's ability to defend the claim brought by the EPA and to defend the present claim brought for indemnification and expenses. It also cannot be disputed that evidence has been dissipated and disappeared and that the passage of time has resulted in the unavailability of witnesses and the fading of memories.

¶ 58 In the instant matter, evidence was presented at trial that many of the employees of Rohm & Haas who were deeply involved with the Whitmoyer purchase, its operation and its remediation efforts, including Thomas Iezzi and F.J. Rarig were deceased. Further, it cannot be seriously argued that the memory of the available witnesses had not faded to some extent over the 33 year interim period between Rohm & Haas' acquisition of Whitmoyer and the trial of this matter. Further, it was clear that some relevant documents had been lost or destroyed by the time Rohm & Haas first gave notice to the insurers.

¶ 59 Based on the foregoing, we conclude that the question whether the insurers were prejudiced by Rohm & Haas' late notice represented a triable issue of fact and, accordingly, that the court erred when it directed a verdict in favor of Rohm & Haas on the basis that insufficient evidence of prejudice was presented for the question to go to the jury.

¶ 60 We have deferred consideration of the issue concerning the trial court's bias and now consider this important question. We have decided that the order granting JNOV was in error and must be vacated. By reinstatement of the jury verdict, which we find supported by the evidence, the insurance defendants are relieved of liability and any issue of calculation of the amount due Rohm & Haas is no longer a consideration. To that extent, the verdict of the trial court is vacated and of no effect. However, since appellants' motion was also to seek recusal of the trial judge from consideration of post-trial motions, it may, of course, be properly argued that if Judge Jaffe should have granted the recusal motion or at least conducted a hearing, the subsequent consideration of the post-trial motions would necessarily be invalidated. We have concluded that, while there is a serious question whether the court properly handled the recusal motion, or should, in fact, have granted it, there is sufficient evidence of the court's unbiased competency to continue with the case. Important to this decision is Judge Jaffe's own declaration that he found that he was "able to proceed with the litigation in a fair and unbiased manner." Accordingly, we have accepted and treated the consideration and disposition of the post-trial motions as a valid exercise of judicial authority. We do so because of the court's overriding declaration that he was untainted by bias and could (and did) proceed in a fair manner. As a reviewing court we are somewhat constrained to so decide since the court's decision to adjudicate the bias issue without a hearing forecloses review of testimonial evidence, and presents a situation where review must be made on the court's bare assertion of freedom from bias.

¶ 61 Nevertheless, after a review of the evidence on the bias issue, we feel obliged to express our view that the recusal motion might well have been handled in a different manner. Appellants first allege that the trial judge erred when he failed to recuse himself from presiding over the post-trial motions and the subsequent damages trial because it is alleged the statements he made to the jurors immediately after trial manifested a personal bias against the insurance companies and in favor of Rohm & Haas. "[A] party to an action has the right to request the recusal of a jurist where that party has a reason to question the impartiality of the court." *Goodheart v. Casey*, 523 Pa. 188,

198, 565 A.2d 757, 762 (1989). A party seeking recusal must assert specific grounds in support of the recusal motion before the trial judge has issued a ruling on the substantive matter before him or her. *Ware v. U.S. Fidelity & Guarantee Co.*, 395 Pa.Super. 501, 577 A.2d 902, 905 (1990).

The proper practice on a plea of prejudice is to address an application by petition to the judge before whom the proceedings are being tried. He may determine the question in the first instance, and ordinarily his disposition of it will not be disturbed unless there is an abuse of discretion.

Due consideration should be given by him to the fact that the administration of justice should be beyond the appearance of unfairness. ... If the judge feels that he can hear and dispose of the case fairly and without prejudice, his decision will be final absent an abuse of discretion.

*Reilly by Reilly v. SEPTA*, 507 Pa. 204, 220, 489 A.2d 1291, 1299 (1985) (citing *Crawford's Estate*, 307 Pa. 102, 160 A. 585 (1931)). Nonetheless, recusal is required wherever there is substantial doubt as to the jurist's ability to preside impartially. *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310 (1995); *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078 (1993); *Municipal Publications v. Court of Common Pleas, et al.*, 507 Pa. 194, 489 A.2d 1286 (1985); *Commonwealth v. Darush*, 501 Pa. 15, 459 A.2d 727 (1983); *Commonwealth v. Boyle*, 498 Pa. 486, 447 A.2d 250 (1982); *Commonwealth v. Perry*, 468 Pa. 515, 364 A.2d 312 (1976). Moreover, because the integrity of the judiciary is compromised by the appearance of impropriety, a jurist's recusal is necessary where his behavior appears to be biased or prejudicial. *Commonwealth v. Benchoff*, 700 A.2d 1289 (Pa.Super.1997).

¶ 62 In the case *sub judice*, appellants' motion for recusal was based entirely on the highly unusual interchange the court had with the jury immediately after the jury's verdict was announced when the judge met with the jury in the jury room.

The motion for recusal contained a recitation of the statements the court made as described in the jurors' sworn affidavits. The motion concluded as follows:

11. By the very nature and timing of the statements made to the jury by the Court, defendants could not have presented this motion based on those statements at an earlier time.

12. Recusal is required whenever a judge has doubts as to his ability to decide objectively and fairly in the proceedings or where there exist factors or circumstances that reasonably call into question the judge's impartiality in the matter.

13. The statements made by the Court to the jury demonstrate that the Court is biased in favor of Rohm and Haas, and so require its recusal from this matter. In addition, even without any actual bias, recusal would still be required because these statements provide a basis upon which the Court's impartiality can reasonably be questioned.

14. For the foregoing reasons, defendants respectfully request that the court recuse itself from further involvement in this case, including the consideration of the parties' respective motions for post-trial relief.

¶ 63 We conclude that the insurers asserted specific grounds in support of their recusal motion in a timely manner. No hearing on the recusal motion was conducted and on July 15, 1997, the motion was summarily denied. The court's reasons for its denial of the recusal motion were later set forth in its opinion of December 19, 1997.

¶ 64 Initially, it is obvious that the court should have provided the parties with a hearing on the recusal motion so that the facts could be explored and an informed decision made. The recusal motion clearly stated facts which would, if proven, call into question the impartiality of the court to continue in the proceeding.

**Disqualification.**

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

Code of Judicial Conduct (1)(a).

¶ 65 Moreover, Judge Jaffe would, under the proffered facts, have almost certainly been a witness himself. Under these circumstances, it would be appropriate for the trial judge to step aside for the appointment of another judge to conduct the hearing.[13] *Municipal Publications v. Court of Common Pleas*, 507 Pa. 194, 489 A.2d 1286.

¶ 66 Absent our decision to presently accept the court's disavowal of bias, a strong case for recusal could be made out. The averments in the juror affidavits, if true, would establish evidentiary support for a conclusion that the judge was positively inclined in favor of Rohm & Haas and that it was not desirable to have a result which would be adverse to Rohm & Haas' economic interests. Although there was no hearing or testimonial basis for actual findings with respect to bias, the court offers some indication of his views in his opinion on the recusal motion dated December 19, 1997. Therein, the court, in discussing this jury proceeding, states that at the inception of the case, he had no preconceived notion of "how the case should be decided." He added that his view during the proceedings "constantly changed" according to the evidence presented. Finally, it was during the four days of jury deliberations that the court reflected "on how it viewed the ultimate result." This self-appraisal is in keeping with the juror affidavits which demonstrate that the court expressed some bias in favor of Rohm & Haas and against jury findings. While the court has the view that the juror affidavits do not accu-

rately reflect the conversation between the jury and the court, the judge is firm in his opinion that if there is to be "comfort" with a jury verdict, it is incumbent on the judge after deliberations to meet with the jury at which time the court should, *inter alia,* "express its personal view" of the trial.

¶ 67 Clearly, a hearing on the evidence and the court's version of the circumstances giving rise to the recusal motion, would have been of significant benefit to a reviewing court faced with the merits of a recusal motion. But, nevertheless, we have stated that we feel constrained by the court's conclusive protestation of non-bias and ability to objectively determine the post-trial motions.

¶ 68 In conclusion, we hold that JNOV was improperly entered on the jury's finding, in verdict question number 7, that Rohm & Haas failed to disclose the Whitmoyer contamination when it purchased the policies, regardless of whether the court's rationale for the imposition of JNOV was as a matter of law or for gross evidentiary insufficiency. We further conclude the court erred in its entry of JNOV with respect to question number 3 regarding the insurers "known loss" defense. Accordingly, we vacate the order of JNOV and reinstate the jury's verdicts. Our determination to reinstate the jury's verdicts with respect to questions number 7 and 3 voids the policies at issue and negates indemnification thereunder. Thus, we also vacate the verdict of the trial court with respect to damages.

¶ 69 The order appealed from is vacated. The court's order of JNOV is vacated and the jury's verdict with respect to questions number 7 and 3 is reinstated. The case is remanded for entry of judgment on the verdict. Jurisdiction is relinquished.

---

13. The judge did not find, nor could it reasonably be said, that the request for recusal was fabricated, frivolous or scurrilous which

might merit summary dismissal. *Municipal Publications,* 507 Pa. at 202, 489 A.2d at 1290.