[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this case the plaintiff, Travelers Property Casualty Company ("Travelers"), seeks a declaratory judgment that Travelers has no duty to defend and provide insurance coverage to H.A.R.T., Inc., and/or Mi Casa for claims arising out of an accident which occurred on August 8, 1997 in which Karol Cortez was killed after she exited a van operated by Mi Casa and was struck by an automobile.
 FACTS
After trial, the court makes the following findings. The parties entered into a stipulation of facts which provides as follows:
On May 20, 1997 Travelers renewed the automobile, fire, excess umbrella, and liability policies of its insured H.A.R.T., Inc. These four policies were billed on an account bill on June 11, 1997. On July 13, 1997, Travelers had not yet received payment from H.A.R.T., Inc. for the account bill. A notice of cancellation was produced for each policy. The effective date of cancellation on the notices was August 3, 1997. The notices of cancellation were mailed by certificate of mailing on July 14, 1997. Travelers did not receive payment from H.A.R.T., Inc. by August 3, 1997.
On Friday, August 8, 1997, an automobile accident occurred, resulting in the death of Karol Cortes. She was killed as she crossed the street after exiting a van insured under H.A.R.T., Inc.'s subject policy with the Travelers. On Monday, August 11, 1997, Tricia Carlson, H.A.R.T., Inc.'s program administrator, learned of the accident from Jorge Rivera, Mi Casa's director.
On Wednesday, August 13, 1997, Thelma Boiseau, an employee of Levine 
Co., H.A.R.T., Inc.'s accountant, was instructed to call Pat Harding at the Travelers Accounting and Billing office in Richmond, Virginia, and ask for a pay arrangement that allowed the subject policy to be reinstated. Pat Harding agreed to 25% down to reinstate retroactive to August 3, 1997. During the phone call, Pat Harding was not told about the loss.
On Thursday, August 14, 1997, Tricia Carlson called Pat Harding, and explained that there was a delay in sending the check because it required two signatures due to H.A.R.T., Inc.'s nonprofit status. She indicated CT Page 6047 she would send the check by federal express that day. Tricia Carlson also told Pat Harding that she wanted the policy reinstated because she was concerned about having automonile coverage for a road trip the organization was having that weekend. Pat Harding agreed to reinstate retoractively so long as she received a fax of the check. Tricia Carlson did not tell Pat Harding about the loss. Also on August 14, 1997, Joanne Esposito, from B. Perkins Company, H.A.R.T., Inc.'s agent on the subject policy, reported the loss to the Travelers claims department.
On the morning of August 15, 1997, Pat Harding received a fax copy of a H.A.R.T., Inc. check dated June 25, 1997. The check had been written in June; however, due to an internal dispute between Mi Casa and H.A.R.T., Inc. with regard to payment of the automobile insurance premiums, as well as internal cash flow problems, the check was not sent until after August 14, 1997. The check that was received by Travelers was for $9,145.07 which exceeded the 25% required by Pat Harding.
Based on evidence presented at trial the court makes the following findings. In 1997 H.A.R.T., Inc. ran the administrative functions for Mi Casa including the acquisition of insurance for their programs. Prior to June 25, 1997 H.A.R.T., Inc. received an invoice for premiums due to the Travelers for Automobile, Fire, Liability, and Excess Umbrella insurance. The invoice indicated that the minimum amount due was $9,145.07 and the due date was July 1, 1997. In June, 1997 checks from H.A.R.T., Inc. accounts were written by Levine and Company, P.C., H.A.R.T.'S accountants. A check payable to the Travelers in the amount of $9,145.07 was written by Levine and Company on June 25, 1997 and sent to H.A.R.T., Inc. At the time H.A.R.T., Inc. was experiencing cash flow difficulties as well as internal disputes as to which account should be the source of the insurance payment to Travelers. As a result of these difficulties and disputes, the check for $9,145.07 was not sent to Travelers, but was held in a desk drawer at the H.A.R.T., Inc. offices.
In accordance with the terms of the insurance policies, Notices of Cancellation for each of the four (4) policies were mailed to H.A.R.T., Inc. and B. Perkins Agency on July 14, 1997 with an effective date of cancellation as August 3, 1997. Those Notices indicated that H.A.R.T., Inc. could avoid cancellation of the policies by making payment prior to the August 3d cancellation date. H.A.R.T., Inc. did not make any payment to Travelers on or before August 3, 1997. Therefore, the policies of insurance were cancelled as of August 3, 1997.
There was no evidence that anyone from H.A.R.T., Inc. took any action whatsoever to reinstate the policies of insurance until after August 8, 1997, the date of the accident in which Karol Cortes died. CT Page 6048
A meeting of the H.A.R.T., Inc. Board of Directors was held on August 12, 1997, just four days after the date of the subject accident. At that meeting Marilyn Rosetti, a member of the Board of Directors, discussed the accident and reported that "the child was getting out of a Mi Casa van and the driver got a parking ticket for letting her out on the wrong side. She was hit by another car and killed." Tricia Carlson was present at that meeting.
On Aug 13, 1997, the B. Perkins Agency, H.A.R.T.'s insurance agent, first leamed of the accident after it received a fax from Elsie DeLeon, an employee of H.A.R.T., Inc. When the B. Perkins Agency learned that there might not be coverage for this accident, Brewster Perkins, head of the agency, contacted Tricia Carlson at H.A.R.T., Inc. and told her to call Travelers. Tricia Carlson's call to Pat Harding at the Travelers on August 14, 1997 was made at the urging of Brewster Perkins because of his concern over H.A.R.T.'s possible exposure to liability arising from the August 8th accident. Carlson knew of the accident, the potential exposure created by the accident, and purposefully failed to advise Travelers of the accident. Instead, she told Harding only that she was concerned that H.A.R.T., Inc. have insurance coverage because MiCasa was planning an annual trip for children and wanted to be sure that there was insurance coverage for the trip. Her story to Harding as to the reason for H.A.R.T.'s reinstatement request was untrue, and she knew it was untrue at the time she made it. She made it with the purpose to deceive Harding and to deter any further inquiry by Harding as to the reasons for the reinstatement or as to whether there had been a loss during the period in which the policies were not in effect.
Patricia Harding told Tricia Carlson that she would reinstate the policies if Carlson sent her a check in a certain amount by overnight mail. The amount Harding mentioned was several thousand dollars less than the amount of the June, 1997 check for $9,145.07 to Travelers which had been sitting in a desk drawer at H.A.R.T., Inc. since June. However, H.A.R.T., Inc. was in a hurry to try to get the policies reinstated and did not have time to obtain a check in the lesser reinstatement amount, so Carlson sent the June, 1997 check to Harding in an attempt to reinstate the policies.
Neither Patricia Harding, nor anyone else at Travelers, except perhaps the President of Travelers, had any authority to reinstate an insurance policy on which a known loss had occurred during the lapse period. If Carlson had advised Harding about the loss, then Harding would have referred Carslon to the Underwriting Department. She would not have agreed to reinstate the policies and would not have taken any action towards reinstating the policies. CT Page 6049
On August 14, 1997, the same date on which Carlson was attempting to obtain reinstatement on the policies (without telling the Travelers about the loss) Joanne Esposito from the B. Perkins Company called Travelers to report the loss. Within 24 hours Dave Lundberg from the Travelers' Claim Office called her back and advised her there was a question of coverage for the accident which occurred on August 8th On that same date Lundberg advised Brewster Perkins that H.A.R.T.'s policies had been cancelled as of August 3 and, therefore, Travelers would not provide coverage for the August 8th accident.
On August 14, 1997, Frederick Roecker, regional director of Underwriting for Travelers' Commercial Claims learned that Pat Harding had indicated to H.A.R.T., Inc. that she would reinstate the policies. Before Harding had begun the reinstatement process, Roecker had the process halted. When Brewster Perkins called Travelers concerning Harding's representations that the policy would be reinstated, Roecker advised Perkins that the policies had been cancelled prior to the date of the August 8th accident, that Harding had no authority to reinstate the policies in light of the loss and that Travelers could not reinstate the policies.
 Discussion of the Law and Ruling
The defendant H.A.R.T., Inc. has filed a general denial of the plaintiffs claims and has filed no special defenses. The interest of the Estate of Karol Cortes are derivative of the interests of H.A.R.T., Inc. This is clear from the content of the "Answer" filed by the Estate, which states that it provides no answer to Travelers' Complaint. In its Answer H.A.R.T., Inc. denies that it failed to make the premium payments due and also denies that Travelers cancelled the policies. However, it is clear that the policies were validly cancelled for lack of payment as of August 3, 1997
At the time of trial it appeared that H.A.R.T., Inc. was claiming that Travelers was estopped from refusing to honor Patricia Harding's agreement to reinstate the policies. Connecticut has adopted the Restatement definition of promissory estoppel. Section 90 of the Restatement (Second) Contracts states that under the doctrine of promissory estoppel "a promise which the promisor should reasonably expect to induce action or forebearance on the part of the promisee or a third person and which does induce such action or forebearance is binding, if injustice can be avoided only by enforcement of the promise." A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. Thus, a promisor is not liable to a promisee who has relied on a promise, if judged by an objective standard, he had CT Page 6050 no reason to expect any reliance at all. Swihart v. Country Home Bakers, 1999 WL 545385, *3 (Conn.Super. 1999). See Finley v. Aetna Life Casualty, 202 Conn. 190, 205, 520 A.2d 208 (1987). "To create an estoppel, facts must be present and known to the insurer, and have been relied upon by the insured to his injury." Mishiloff v. American CentralInsurance Co., 102 Conn. 370, 380, 128 A. 33 (1925). "An insured cannot claim an estoppel where he himself knows the true facts, for in such a case, it is clear that he has not been misled by the insurer." Id. "An estoppel arises when the [insured], because of some act or conduct of the insurer, has been dissuaded from obtaining other insurance upon the property and has proceeded to rely upon the validity of the policy he holds." Vyn v. Northwest Casualty Co., 301 P.2d 869, 871 (Cal. 1956). Seealso Monteleone v. Allstate Ins. Co., 51 Cal.App.4th 509, 516 (1996) (appellants could not have been prejudiced since the accident already had occurred before they ever sent in the premium.).
Similarly, in Colagoivanni vs. Premium Financing Specialists, Inc., 1996 WL457006 (1996, Corradino, J.), the plaintiff suffered a loss to his property on February 8, 1993. He submitted a claim notice to his insurer. The insurer returned the loss notice on February 15, 1993, claiming the policy had been canceled on December 23, 1992 for nonpayment of premium. The insured indicated he had requested reinstatement with his insurance agent. As such, he had relied upon his agent to reinstate the policy. One of the significant questions before the court was whether reinstatement was requested prior to the loss. "[N]othing in the law would require a company [to provide reinstatement] absent a finding of detrimental reliance. . . ." Id. The court stated that, "There can be no detrimental reliance because [the insurance agent] in his deposition denied receiving a copy of the reinstatement request before the date of the loss and there is nothing to indicate the plaintiff did so." Id. at *13.
Travelers became aware of the accident on August 14, 1997, and promptly notified H.A.R.T.'s insurance agent that coverage would not be afforded for the accident. This noitification took place during a telephone conversation between Fred Roecker and Brewster Perkins on August 14, 1997. H.A.R.T., Inc. presented no evidence that it detrimentally relied upon Pat Harding's purported agreement to reinstate coverage with respect to the August 8th loss, because that loss had already occurred on the date of the agreement. In order to hold that Travelers is estopped from denying coverage the court would have to find that H.A.R.T., Inc. was dissuaded from obtaining other insurance to cover the Cortes accident because it was relying on the Travelers coverage. H.A.R.T., Inc. presented no such evidence. Moreover, it would have been impossible for H.A.R.T., Inc. to find insurance for a fatality that had already occurred. Further, Travelers never made the representation that it would insure losses during the lapsed period, and when it did learn of a loss, CT Page 6051 it promptly told H.A.R.T.'s insurance agency that there was no coverage. "Courts will not control the discretion of an insurer in refusing to reinstate, unless its officers have acted dishonestly and in bad faith."Couch on Insurance 2d § 69:20. Travelers has not acted dishonestly, or in bad faith. Instead, when it became aware of facts that were already known to the insured at the time of the request for reinstatement, it made the decision not to reinstate the subject policy.
The insurance policies were cancelled and reinstatement never occurred because Patricia Harding had no authority to reinstate a Travelers policy under the circumstances of this case. A loss had occurred after the policy was cancelled but before the request for reinstatement was made. The reinstatement process within the Travelers never occurred because the process was halted as soon as Travelers leamed of the loss.
At trial employees of H.A.R.T., Inc. admitted that they knew that the insurance policies' were cancelled as of August 3rd The defendant H.A.R.T.'s Answer raises no special defenses. However, in their Post-Trial Memorandum, the defendants have taken the position for the first time that the policy was not validly cancelled because the plaintiff did not give notice to the City of Hartford, an additional insured. They rely on Connecticut General Statutes § 38a-324, which provides that no notice of cancellation is effective unless delivered by the insurer to the named insured by the required date. The named insured on the policies was H.A.R.T., Inc. There is no dispute that the notice of cancellation was timely delivered to H.A.R.T., Inc. The defendants claim that because the City of Hartford was listed as an additional insured on a Certificate of Insurance issued by B. Perkins Agency, notice to the City of Hartford was required for a valid cancellation. The defendants have presented no authority to support the foregoing claim. The Certificate of Insurance in question was created by the B. Perkins Agency and was never sent to Travelers. The Certificate does not contain any language that denominates the City of Hartford as either an additional insured or a named insured. Rather, the City is identified as the Certificate Holder. The policy contains language which makes it clear that the Certificate Holder gains no additional rights by virtue of being a Certificate Holder:
 This Certificate is issued as a matter of information only and confers no rights upon the Certificate Holder. This Certificate does not amend, extend or alter the coverage afforded by the policies below.
The defendants have also taken the position that a "grace period" existed for a period of ten days from the date of cancellation which conferred upon H.A.R.T., Inc. a right to reinstatement within the grace period. Again, the CT Page 6052 defendants have provided no authority for this proposition. That right is not expressed in any of the policies. The "grace period" was only an internal processing window which allowed Travelers' employees to effectuate the reinstatement of an existing policy without having to go through the additional steps required in issuing a new policy.
Even if the Travelers had completed the reinstatement of the policies at issue here, there would still be no coverage for the August 8th accident because H.A.R.T., Inc. breached the concealmont condition of the business auto policy. That condition provides:
 B. GENERAL CONDITIONS
2. CONCEALMENT, MISREPRESENTATION OR FRAUD
 This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other insured, "at any time," intentionally conceal or misrepresent a material fact concerning:
a. This Coverage Form;
b. The covered "auto";
c. Your interest in the covered "auto"; or
d. A claim under this Coverage Form.
Tricia Carlson testified that her concern about having the H.A.R.T./MiCasa vans "on the road" without insurance prompted her call to Patricia Harding at Travelers to obtain reinstatement of the insurance. However, she made the call at the urging of Brewster Perkins, H.A.R.T.'s insurance agent, on August 14th after he learned of the Karol Cortes accident. This fact, combined with Carlson's apparent lack of concern during the period when she knew that H.A.R.T.'s insurance policies were going to be cancelled, or during the period between the date of cancellation and the date she learned of the death of Karol Cortes, compels the court to conclude that Carlson called Patricia Harding out of her concern over the Karol Cortes loss and that Carlson intentionally concealed material facts regarding the Cortes accident. Based on the foregoing, even if the policy had been fully resintated, there would be no coverage for the Karol CT Page 6053 Cortes accident because the policy is void based on H.A.R.T.'s concealment of a material fact concerning a claim under the policy.
Even if the Travelers had completed the reinstatement of the policies at issue here, there would still be no coverage for the August 8th accident under the "known loss" doctrine. "Insurance is a contract whereby one undertakes to indemnify another against a loss, damage, or liability arising from a contingent or unknown event." Vyn v. NorthwestCasualty Co., 301 P.2d 869, 872 (Cal. 1956). The "known loss" doctrine has not been addressed by the Connecticut courts. The known loss doctrine is a common law concept that derives from the fundamental concept of fortuity in insurance law. Essentially, the doctrine provides that one may not obtain insurance for a loss that either has already taken place or is in progress. See generally 12 John A. Jean Appleman, InsuranceLaw Practice § 7001. Courts recognize that "[t]he rule is based on the realization that the purpose of insurance is to protect insureds against unknown risks." Appalachian Ins. Co. v. Liberty Mutual Ins. Co.,676 F.2d 56, 63 (3d Cir. 1982).
State courts are divided as to the scope of the known loss doctrine. Some have construed it quite narrowly, barring coverage only when the insured knew of the certainty of damages and liability. See MontroseChemical Corp. v. Admiral Ins. Co., 10 Cal.4th 645, 913 P.2d 878, 906,42 Cal.Rptr.2d 324 (1995) (case involved multiple potential polluters and the holding was limited to context of continuous or progressively deteriorating property damage or bodily injury). Other courts have construed the doctrine more broadly, and refused to find coverage when the insured was substantially aware of a risk of. For example, Pennsylvania has broadly construed the known loss doctrine. In Rohm and Haas Co. v. Continental Casualty Co., et al.,732 A.2d 1236, 1256 (Pa.Super. 1999), the Court rejected the argument that the doctrine only applies in cases where the insured knew with certainty of damages and liability. The Court held that the appropriate standard for the defense in Pennsylvania is "whether the evidence shows that the insured was charged with knowledge which reasonably shows that it was, or should be, aware of a likely exposure to losses which would reach the level of coverage." 732 A.2d at 1258. The Court further held that the defense should apply when, "a sophisticated insured . . . is faced with mounting evidence that it will likely incur responsibilities to the extent of the insurance which is sought." Id.
Acknowledging that the case dealt specifically with allegations of fraud, the Court accepted the notion that the known loss defense is one that is based in fraud, which "requires proof that the insured withheld material information concerning the existence of . . . damage . . . CT Page 6054 for which the insured subsequently obtained insurance." Id. at 1258, (quoting Domtar, Inc. v. Niagara Fire Ins. Co.,563 N.W.2d 724, 737 (Mm. 1997)). The Court concluded that, based on the "abundant notice" of inevitable massive environmental problems, the insured knew or should have known of its potential exposure to liability at the time it contracted for the insurance policy. Id. at 1259.
Montrose Chemical and Rohm and Haas were both cases of environmental contamination in which there were multiple parties with potential liability, the "loss" occurred over the course of many years and the extent of the insured's knowledge of the loss was subject to significant debate. In this case the loss arose from a single, instantaneous and egregious event. H.A.R.T.'s knowledge of the loss was clear and unequivocal. Therefore, the Cortes accident is uninsurable as a matter of law because it was a known loss.
H.A.R.T., Inc. defended this case under a general denial and filed no special defenses. In their Post-Trial Memorandum the defendants have raised for the first time the defense that the policies at issue were not validly cancelled because Travelers failed to comply with notice provisions of Connecticut General Statutes § 14-29 (c)[1], which they contend require that notice of cancellation be served on the Commissioner of Motor Vehicles.
The defendants are precluded from asserting this defense because they did not plead it as a special defense, did not raise it as a defense at trial, and finally, presented no evidence from which the court can determine whether the Travelers issued an insurance or indemnity bond within the meaning of § 14-29 and filed the requisite certificate with the Commissioner of Motor Vehicles, thereby triggering the requirement of notice to the Commissioner of Motor Vehicles prior to cancellation, or if H.A.R.T., Inc. fell within one of the many exceptions contained in the statute such that no indemnity bond, certificate, or notice to the Commissioner of Motor Vehicles was required.
Facts which are consistent with the plaintiffs statements of fact but show, notwithstanding, that the plaintiff has no cause of action, must be specially pleaded. Practice Book § 10-50. "A defendant's failure to plead a special defense precludes the admission of evidence on the subject." DuBose v. Carabetta, 161 Conn. 254, 261, 287 A.2d 357 (1971). The defendant's failure to assert a special defense in the pleadings constitutes a waiver of that defense and the defense should not be considered by the trial court. Oakland Heights Mobile Park, Inc. v.Simon, 36 Conn. App. 432, 436, 651 A.2d 281 (1994). "The purpose of pleadings is to apprise the court and opposing counsel of the issues to be CT Page 6055 tried, not to conceal basic issues until after the close of the evidence." Id. at 435. It is fundamentally unfair to allow any defendant to wait until after the time of trial to introduce an unplead, and unproven defense. "Such conduct would result in "trial by ambuscade' to the detriment of the opposing party." Id. at 437. (Citing Manning v.Michael, 188 Conn. 607, 613, 452 A.2d 1157 (1982)).
The defendants have waited until three months after the conclusion of the trial and a year after. the pleadings were closed to allege § 14-29
(c) as a defense. This delay is contrary to the Practice Book and the case law, and is fundamentally unfair to the plaintiff. Moreover, there was no evidence whatsoever presented at trial from which the court can determine whether § 14-29 (c) required Travelers to give a notice of cancellation to the Commissioner of Motor Vehicles. Under the terms of the statute such notice was required only if Travelers had filed a certificate with the Commissioner of Motor Vehicles. The statute contains many exceptions to the certificate requirement. There is absolutely no way to determine whether any exceptions applied to Travelers or H.A.R.T., Inc.
Based on the foregoing, the court finds that Travelers cancelled the insurance policies issued to H.A.R.T., Inc. effective August 3, 1997. The policies were never reinstated and the accident of August 8, 1997 was not covered by the Travelers policies.
 By the court, Aurigemma, J.