J-A14023-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RICHARD L. MOORE AND BONNIE B. MOORE, CO-TRUSTEES OF THE RICHARD L. MOORE LIVING TRUST | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| MULLIGAN MINING, INC., AND S&K ENERGY, INC. AND SEAN D. TAYLOR | : : | No. 1497 WDA 2018 |
| APPEAL OF: S&K ENERGY, INC. AND SEAN D. TAYLOR | : : | |

Appeal from the Judgment Entered, September 20, 2018,
in the Court of Common Pleas of Washington County,
Civil Division at No(s):  2016-1152.

BEFORE:  OTT, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY KUNSELMAN, J.:          **FILED OCTOBER 16, 2019**

Appellants, Sean D. Taylor and S&K Energy, Inc., appeal from the judgment entered against them, jointly and severally, in the amount of $34,882.99 following a bench trial.  This breach of contract action arose from Appellants' failure to pay "roll-back taxes" assessed pursuant to the Clean and Green Act[1] as allegedly promised under a Lease of property for strip mining.  After careful and thorough review, because neither of the Appellants is contractually or legally obligated to pay the taxes, we reverse.

---

[1] The Pennsylvania Farmland and Forest Land Assessment Act of 1974, 72 P.S. § 5490.1 *et seq*. commonly known as the Clean and Green Act.

Richard L. Moore and Bonnie B. Moore were the owners of certain property in Smith Township, Washington County, Pennsylvania. In 1980, Mr. Moore enrolled the property in the Clean and Green program.[2] The property enjoyed preferential tax status since that time.

In 2005, the Moores agreed to a three-year strip mining lease, commencing May 12, 2005, and ending May 12, 2008, with Mulligan Mining, Inc. The MMI Lease was executed by the Moores and Sean D. Taylor, president and sole shareholder of MMI. The MMI Lease contained several provisions of particular relevance. Paragraph 8 of the Lease provided:

> Operator agrees to pay any and all *ad valorem* taxes assessed against the entire Premises on account of the surface estate thereon, all taxes on all improvements, equipment and other property installed on the Premises for any year during the continuance of this Agreement. Operator also agrees to pay **when due all taxes** except income taxes of Owners, **which may arise or come dues as a result of this Agreement** . . . . This paragraph does not obligate Operator to pay real estate taxes which would be levied and due whether or not surface mining operations were taking place **except that Operator shall be responsible to pay any "rollback" taxes which may be assessed should the mining operation cause Owners to lose their preferential tax treatment under the Agricultural Tax Assessment Act commonly referred to as the Clean and Green Law.**

Additionally, Paragraph 11 of the Lease provided:

> Operator shall not convey, assign, license, grant any contract rights in, or by any other method or means alienate or effect its exclusive rights in this Agreement whether voluntary or involuntary without the express written consent of Owners, which

---

[2] The Clean and Green Act affords certain property preferential tax treatment so long as it is maintained in accordance with the requirements of the Act.

consent may be conditioned, restricted or withheld in the sole and arbitrary discretion of Owners. This prohibition or restraint reserved to Owners shall be broadly construed so as to reserve to Owners the privilege of selection and approval of any person partnership, corporation or other entity to whom rights and privileges granted to Operator herein might become alienated, to any interest in this Agreement, and as to any portion of the lands described, which approval will not be unreasonably withheld . . . Operator may assign this Agreement to a corporation, partnership or entity in which the Operator maintains a controlling interest in which event Operator shall nevertheless remain personally responsible for all performance hereunder.

Paragraph 13 of the Lease provided:

This Agreement and all of its covenant terms and conditions shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

Between 2005 and 2008, MMI conducted strip mining activities on the Moores' property. The Moores never informed Washington County that this activity was being conducted on their property and that its use had changed, contrary to the requirements of the Clean and Green Act.[3]

After mining operations ceased in late 2008, the Moores complained to DEP about the condition of their property. In 2009, MMI began reclamation activities on the property. During this period, Taylor sought to address the Moores' concerns, and told her that she did not need to contact DEP. Taylor further stated that he would "take care of it" and that he "guaranteed the contract".

---

[3] 72 P.S. § 5490.4(c.1).

- 3 -

On July 15, 2010, Taylor entered into a Stock Purchase Agreement with Mulligan Mining Holdings, Inc., a Delaware corporation (the Holding Company). Pursuant to this Agreement, Taylor, as the sole shareholder of MMI, sold MMI to the Holding Company. Certain equipment, permits, leases, contracts and other assets and responsibilities of MMI's transferred with the stock. Several provisions of that agreement are pertinent to the disposition of this matter.

Paragraph 4.15 listed the environmental permits held by MMI, including one for the Moores' property.

Paragraph 4.19, listed the leases held by MMI. Notably, however, it did not reference the Moores' Lease.

Under Paragraph 6.3, "Personal Guarantees", the Holding Company agreed to indemnify Taylor for all amounts he was required to pay to a third party in connection with specifically listed personal guarantees set forth in 6.3 of the Seller Disclosure Schedule. Included on that schedule was an Indemnity Agreement with Rockwood Casualty Insurance Company who held the reclamation bonds, for at least two properties, one being the subject property.

Finally, particularly relevant to the Stock Purchase transaction, the Holding Company funded Taylor's buyout and acquisition of MMI with a loan from Angus Coal and SPE NO. 1 LLC. and Angus Partners. The assets of the the Holding Company and MMI were pledged as collateral.

On July 21, 2010, shortly after Taylor sold MMI, Taylor established S&K as a Pennsylvania corporation. Taylor was the sole shareholder and officer of

the newly incorporated S&K. S&K, like MMI, conducted mining and reclamation activities.

On December 27, 2012, the Moores, by general warranty deed, transferred all of their right, title and interest in the property to the Berrisford Family Partners, LP, a Pennsylvania Limited Partnership. This conveyance did not except or reserve any rights under the MMI Lease.

In October 2012, the Holding Company ceased operations. On March 5, 2013, S&K purchased the loan that Angus Coal had given to the Holding Company to purchase Taylor's stock in MMI and the company. Sometime thereafter, S&K foreclosed on this loan and acquired certain collateralized assets from MMI. In particular, this included the environmental permit for the subject property as well as other permits, two surface leases unrelated to the subject property, and various pieces of equipment. After the transfer of this permit to S&K in August 2013, S&K conducted some outstanding reclamation activities required under those permits.

On June 17, 2013, the Berrisford Family Partners, LP reconveyed the property to the Moores as Co-Trustees of the Richard L. Moore Trust, the plaintiff in this action. This conveyance also did not except or reserve any rights under the MMI Lease.

In 2015, while conducting a "systematic review", Washington County discovered that the subject property, now owned by the Moore Trust, had strip mining activity on it. This activity triggered the imposition of "roll-back taxes" by the County under the Clean and Green Act. On October 13, 2015,

Washington County notified the Moore Trust that it was imposing "roll-back taxes" in the amount of $34,882.99 upon the subject property for violation of Clean and Green Act. Shortly thereafter, on November 6, 2015, the Moore Trust demanded that MMI, via correspondence to Taylor, pay these taxes. However, no payment was made. As a result, the Moore Trust paid the taxes. The Moore Trust subsequently filed suit on February 29, 2016, against MMI, Taylor, and S&K for breach of the Lease. MMI never responded to the Moore Trust's complaint, and a default judgment was entered against it.

Following a bench trial on the remaining claims against Taylor and S&K, the trial court entered a decision in favor of the Moore Trust. In sum, the trial court concluded that Taylor personally guaranteed MMI's Lease, that S&K was a successor of MMI, and, therefore, both were liable for MMI's obligations under the Lease. Because they refused to pay the "roll-back taxes" attributable to the strip mining activity, the trial court found that Appellants breached the terms and conditions of the Lease, and ordered them to pay damages, totaling $34,882.99, to the Moore Trust.

Appellants filed a motion for post-trial relief seeking JNOV or alternatively, a new trial, which the trial court denied. Judgment was entered on September 20, 2018.

Appellants timely appealed. The trial court and Appellants complied with Pennsylvania Rule of Appellate Procedure 1925.

Appellants raise the following issues on appeal:

I. The Trial Court erred in determining that The Moore Trust had standing to state a cause of action because The Moore Trust was not a party to, an assignee of, or a successor to the Agreement and therefore lacked standing to enforce the contract.

II. The Trial Court erred in concluding that The Moore Trust's claims are not barred by the four-year statute of limitations applicable to claims arising from contractual obligations.

III. The Trial Court erred in concluding that The Moore Trust was not barred by the doctrine of laches because Bonnie B. Moore and Richard L. Moore failed to notify the Washington County Tax Assessor in a timely manner that the property was being used for commercial purposes, thereby creating an unreasonable delay in the assessment of roll back taxes, which prejudiced S&K and Taylor.

IV. The Trial Court erred in concluding that S&K satisfies an exception required to impose successor liability because The Moore Trust failed to satisfy the burden of proof to establish that S&K is a successor of [MMI], or a successor to the agreement entered into by [MMI] by way of *de facto* merger.

V. The Trial Court erred in determining that The Moore Trust was not barred by the Statute of Frauds 33 P.S. §3 with respect to Taylor since The Moore Trustees admit there is no written agreement establishing that Taylor assumed the debts and obligations of [MMI].

VI. The Order entered September 20, 2018, is a final judgment from which S&K and Taylor appealed to this Honorable Court, and the Washington County Prothonotary's Office confirmed that the judgment was entered.[4]

Appellants' Brief at 5. Appellants ask this Court to enter judgment in their favor.

---

[4] Upon receipt of this appeal, the Court issued an Order directing that a judgment be entered in this matter as it did not appear that the prothonotary below had done so. Upon further review, it is evident that judgment was entered on September 20, 2018. This appeal was filed thereafter. Consequently, we need not address this issue in any detail.

Our review in a non-jury case is

limited to a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

*Hart v. Arnold*, 884 A.2d 316, 330–331 (Pa. Super. 2005), *appeal denied*, 897 A.2d 458 (2006) (citations omitted). "The [trial] court's findings are especially binding on appeal, where they are based upon the credibility of the witnesses, unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence." *Id.* (citations omitted). "Conclusions of law, however, are not binding on an appellate court, whose duty it is to determine whether there was a proper application of law to fact by the lower court." *Tagliati v. Nationwide Ins. Co.,* 720 A.2d 1051, 1053 (Pa. Super. 1998), *appeal denied,* 740 A.2d 234 (1999). "With regard to such matters, our scope of review is plenary as it is with any review of questions of law." *Id.*

We also must consider whether the trial court properly denied Appellants' post-trial motion seeking JNOV. The propriety of a JNOV is a question of law, and therefore, our scope of review is plenary. *Foster v. Maritrans, Inc.*, 790 A.2d 328, 330 (Pa. Super. 2002).

There are two bases upon which a JNOV can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *Reott v. Asia Trend, Inc.*, 7 A.3d 830, 835 (Pa. Super. 2010), *aff'd*, 55 A.3d 1088 (Pa. 2012). With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. *Id.* With the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure. *Id.*

> Moreover,
>
> [i]n reviewing a trial court's decision whether [] to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner.

*Reott*, 7 A.3d at 835. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. *Eichman v. McKeon*, 824 A.2d 305, 312 (Pa. Super. 2003). Thus, when there is a question of fact to be resolved, it is within the purview of the factfinder. *Rohm & Hass Co. v. Continental Cas. Co.*, 732 A.2d 1236, 1248 (Pa. Super. 1999). JNOV should not be entered where evidence is conflicting upon a material fact. *Id.*

"Our standard[s] of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical." *Reott*, 7

A.3d at 835. "We will reverse a trial court's grant or denial of a [JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case." *Id.*

In their first issue, Appellants contend that the trial court erred in concluding that the Moore Trust had standing to pursue its claim for payment of the "roll-back taxes" under the Lease. Specifically, Appellants argue that the Moore Trust was not a party to the Lease. Moreover, according to Appellants, by the time the property was transferred to the Moore Trust, the Lease had expired, and thus no right existed to transfer to the Moore Trust even if it was considered a successor. Appellants' Brief at 15-16. We disagree.

In Pennsylvania, a party who files a claim and seeks a judicial resolution "must establish as a threshold matter that he has standing to maintain the action." *Fumo v. City of Philadelphia*, 972 A.2d 487, 496 (Pa. 2009). The core concept of standing "is that a person who is not adversely affected in any way by the matter he seeks to challenge is not 'aggrieved' thereby and has no standing to obtain a judicial resolution of his challenge." *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 280–81 (Pa. 1975) (plurality). "In an action based upon a contract, the complainant, to establish standing, must plead and prove its right to sue under that instrument." *JP Morgan Chase Bank, N.A. v. Murray*, 63 A.3d 1258, 1263 (Pa. Super. 2013). "When suit is brought against the defendant by a stranger to his contract, he is entitled to proof that the plaintiff is the owner of the claim against him . . . . Otherwise, the defendant might find himself subjected

to the same liability to the original owner of the cause of action in the event that there was no actual assignment." ***Produce Factors Corp. v. Brown***, 179 A.2d 919, 921 (Pa. Super. 1962). "Before a party is entitled to recover on a lease or contract, the burden is on him to show that he has an interest therein." ***Fourtees Co. v. Sterling Equip. Corp.,*** , 363 A.2d 1229, 1232 (Pa. Super. 1976). A challenge to the standing of a party to maintain the action raises a question of law. ***In re Milton Hershey Sch.,*** 911 A.2d 1258 (Pa. 2006).

Under the Lease, MMI agreed to pay "roll-back taxes" to the Moores. As argued by Appellants, the Moore Trust was not a party to the Lease. This, however, does not preclude the Moore Trust from having standing to bring the instant action.

MMI and the Moores clearly set forth their intention as to who could enforce the terms and conditions of the Lease, including payment of any "roll-back taxes". Paragraph 13 of the Lease provided:

> This Agreement and all of its covenant terms and conditions shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, ***successors*** and assigns.

(emphasis added). Based upon this provision, it is evident that MMI and the Moores agreed that the rights and obligations under this Lease would flow to their successors; the parties intended that a successor of either party would

be able to enforce the terms of the Lease.[5]  Further, as observed by the trial court, the Lease did not define the meaning of successor, but the common meaning is "a person or thing that follows."[6]

Here, the Moore Trust is a successor-in-interest to the Moores.  The Moores transferred their property, which was the subject of the Lease, to Berrisford.  Thereafter, Berrisford conveyed it to the Moore Trust.  The Moore Trust is the current owner of the property which was the subject of the Lease and upon which the County assessed and imposed "roll-back taxes".  This created a lien upon the property, negatively affecting its ownership rights in the property.  Absent an agreement otherwise, the Moore Trust would have to pay the taxes or incur the lien.  Thus, the Moore Trust is a successor under the Lease.

Moreover, contrary to Appellants' argument, the right to have the "roll-back taxes" paid, did not expire with the expiration of the Lease, and was transferable to the Moores' successor.  The trial court noted that although the Lease was for a three year period, the Lease did not limit MMI's obligation to pay taxes to a particular time period.  Trial Court Opinion, 8/31/18, at 10.  Rather, the Lease provided that the Operator "agrees to **pay when due all**

---

[5] We note, as the trial court observed, that MMI was required to obtain the Moores consent before assigning/transferring its rights under the Lease. However, no such limitation was imposed upon the Moores.

[6] "successor." http://www.dictionary.com (last visited 8/29/19).

*taxes* except income taxes of Owners which *may arise or come due* as a result of this Agreement." In particular, the Lease stated: "Operator shall be responsible to pay *any* 'rollback taxes' which may be assessed should the mining operation cause Owners to lose their preferential tax treatment." This language is very broad. Furthermore, the payment of "roll-back taxes" was not limited to or for a specific period of time, except as provided by the Act. Unlike the payment of other taxes under this Lease, which were payable only for the Lease's term, it did not limit MMI's obligation to pay "roll-back taxes" for only the period of 2005 to 2008. This interpretation is consistent with the treatment of "roll-back taxes" under the Act.

When the use of a property enrolled in the Clean and Green program changes to a use which is inconsistent with the requirements of the Clean and Green Act (primarily agricultural and forest) and a violation occurs, the property loses its preferential tax treatment. The property is then subject to penalty in the form of "roll-back taxes" plus interest. 72 P.S. 5490.5a. "Roll-back taxes" is defined as:

> The amount equal to the difference between the taxes paid or payable on the basis of the valuation and the assessment authorized hereunder and the taxes that would have been paid or payable had that land been valued, assessed and taxed as other land in the taxing district in the current tax year, the year of change, and in six of the previous tax years or the number of years of preferential assessment up to seven.

72 P.S. § 5490.2. Under the Lease, MMI agreed to pay "roll-back taxes" imposed as provided for in the Act, when assessed. Thus, the lessor's right

to have the "roll-back taxes" paid did not expire with the expiration of the Lease and was transferable to the Moores' successor, here the Moore Trust.

Furthermore, the obligation to pay the "roll-back taxes" under the Lease was not personal to the Moores, as claimed by Appellants. Instead, it was a covenant that ran with the land.

> The usual test for determining whether the covenant under consideration runs with the land seems to be that if the covenant in the lease will be of benefit either to the landlord or tenant by reason of his relation to the particular land then it touches or concerns the land so as to run.

*Youghiogheny-Pittsburgh Coal Co. v. Carlet*, 92 Pa. Super. 40 (1927). As such, pursuant to 21 P.S. § 3, the right and claim asserted in this action, to have the roll back taxes paid, and given under the Lease to the Moores by MMI, transferred with the property from the Moores to Berrisfield and finally to the Moore Trust, the plaintiff in this matter. 21 P.S. § 3 provides:

> All deeds or instruments in writing for conveying or releasing land hereafter executed, granting or conveying lands, unless an exception or reservation be made therein, shall be construed to include all the estate, right, title, interest, property, claim, and demand whatsoever, of the grantor or grantors, in law, equity, or otherwise howsoever, of, in, and to the same, and every part thereof, together with all and singular the improvements, ways, waters, watercourses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereto belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof.

21 P.S. § 3. The trial court correctly observed that there was no reservation of this right or claim in either of the deeds, and therefore transferred with the deeds.

Thus, as the entity aggrieved by the imposition of the "roll-back taxes" upon its property and Appellants' refusal to pay in accordance with the Lease, the Moore Trust has standing to bring this action, seeking payment of the "roll-back taxes". We conclude that the trial court did not err on the issue of standing.

In their second issue, Appellants contend that the Moore Trust's cause of action was barred by the four-year statute of limitations, and thus, the trial court erred. Specifically, Appellants argue that because the contract expired in 2008 and no contract existed in 2015, there could not have been a breach in 2015 when the Moore Trust demanded payment. Appellants' Brief at 21. Appellants further argue that the statute of limitations began to run in 2005 when the strip mining began and the land use changed. *Id.* at 23. Thus, according to Appellants, the statute of limitations ran at the earliest in 2009, or the latest in 2012. We disagree.

Indisputably, this breach of contract action is governed by the four-year statute of limitations set forth in 42 Pa.C.S.A. § 5525. Generally speaking, in an action for breach of contract, the statute begins to run on the date the action accrues—the date of the breach. *Packer Soc. Hill Travel Agency, Inc. v. Presbyterian Univ. of Pa. Med. Ctr.,* 635 A.2d 649, 652 (Pa. Super. 1993). The breach occurs when payment under the contract is demanded and not made. *Id.*

Based upon the foregoing principles, it is evident that the determination of when the statute of limitations begins to run focuses on the point at which

there is a breach of duty or obligation. This is also true when the "occurrence rule", which Appellants rely upon, applies.[7] Here, "roll-back taxes" were not assessed until October 13, 2015. Thereafter, the Moore Trust, who owned the property upon which the taxes would be imposed, demanded payment from MMI pursuant to its promise under the Lease. When MMI refused to pay, the breach occurred, and the Moore Trust's cause of action accrued. Consequently, contrary to Appellants' argument, it was not the change in the use of the property that triggered the accrual of the breach of contract action, but rather the failure to pay in accordance with the terms of the Lease upon demand of the Moore Trust.

Appellants' argument that the Moores were not reasonably diligent in learning of the assessment sooner because they failed to report the property's change in use as required under the Act, is likewise unpersuasive. First, argument is usually asserted when a plaintiff argues application of the discovery rule. Here, however, the Moore Trust did not raise it. Moreover, again, the inquiry of whether a plaintiff was reasonable in discovering his injury goes to the reasonableness of discovering the breach itself by the contracting party, not an event which might have triggered a breach.

Furthermore, we find no authority, and Appellants cite none, for the proposition that the statute of limitations began to run when the Lease

---

[7] We note that the "occurrence rule" has typically been applied in legal malpractice cases. In those cases, under this rule, the cause of action accrues when the attorney failed to perform as required, i.e., the breach of duty, rather than when the client incurs an actual loss.

expired. Had the obligation breached been of a different nature, we might agree. However, because no taxes became due and owing until the county assessed the "roll-back taxes", no breach of contract had yet occurred. Once the "roll-back taxes" were imposed, and the Moore Trust demanded payment and was refused, the four-year statute of limitations began to run. Consequently, we conclude that the trial court did not err when it held that the Moore Trust's claim was timely and could proceed.

In their third issue, Appellants contend that the trial court erred in concluding that the doctrine of laches did not apply. Specifically, they argue that the Moores failed to notify the Washington County Tax Assessor in a timely manner that the property was being used in violation of the Clean and Green Act. By failing to do so, the Moores unreasonably delayed the imposition of the "roll-back taxes" and prejudiced the Appellants. Thus, according to Appellants, the Moore Trust's claim is barred by laches. We disagree.

Independent of a limitations period, an action may be dismissed on the basis of laches. Unlike the statute of limitations,

> the application of the equitable doctrine of laches does not depend upon the passage of a definite period of time but whether, under the circumstances, the complaining party's lack of diligence has prejudiced another's rights. The doctrine of laches may apply whenever the position or rights of a party who objects to a review have been so prejudiced by the length of time and inexcusable delay, together with attendant facts and circumstances, that it would be an injustice for the court to grant the relief sought.

33 Standard Pennsylvania Practice 2d *Effect of laches* § 158:184 (footnotes omitted).

In reviewing this issue, we recognize that the Moores were required to notify the County within 30 days after the change in use of their property.[8] They clearly were remiss in not doing so. Nonetheless, laches is an equitable doctrine which cannot be asserted in an action at law. ***Leedom v. Spano***, 647 A.2d 221, 228 (Pa. Super. 1994); ***Transbel Inv. Co. v. Scott***, 26 A.2d 205, 207 (Pa. 1942). Therefore, the doctrine of laches does not apply in this case.[9]

In their fourth issue, Appellants contend that the trial court erred in concluding that S&K was liable as MMI's successor. Specifically, they argue that the evidence did not satisfy the *de facto* merger exception. There was no continuity of ownership, management, personnel, physical location, assets or general business operations. Appellants' Brief at 34. Consequently, according to Appellants, S&K cannot be held liable for payment of the "roll-back taxes" under the Lease. ***Id.*** at 35. We agree.

---

[8] 72 P.S. § 5490.4(c.1).

[9] Here, the trial court concluded that laches did not apply, but on different grounds. It based this decision on its factual findings that the action was promptly brought, six months after refusal to pay, and that Taylor and S&K were not prejudiced. Trial Court Opinion, 8/31/18, at 18. Although the trial court should not have considered the doctrine of laches in this case, we conclude that it was harmless error given that the trial court ultimately did not find laches.

Generally, the issue of successor liability arises when one company sells or transfers all or a substantial portion of its assets to another company. Under these circumstances, the latter is not liable for the debts and liabilities of the transferor simply by virtue of its succession to the transferor's property. **Husak v. Berkel, Inc.**, 341 A.2d 174, 176 (Pa. Super. 1975). In order to find that this general rule is not applicable and that the transferee does acquire such liability, one of the following must be shown: (1) the purchaser expressly or impliedly agrees to assume such obligation; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is fraudulently entered into to escape liability. **Continental Ins. Co. v. Schneider, Inc.**, 873 A.2d 1286, 1291 (Pa. 2005); **Husak**, 341 A.2d at 176.

Although Appellants address this issue under the *de facto* merger exception, the trial court concluded that S&K was liable as a successor of MMI based upon application of the third exception, continuity. As a result, the trial court held S&K liable for the obligations of MMI, including payment of the "roll-back taxes" under the Lease. Because the continuity and the *de facto* merger exceptions are often considered interrelated, if not the same, and both have been raised, we examine both under the circumstances of this case.

Before addressing the specifics of these exceptions, we make several general observations, which are significant to the outcome of this case. First, in these types of cases, the analysis typically involves the examination of the seller corporation's makeup prior to the sale of its assets compared to the

makeup of the acquiring company upon acquisition. Here, the parties presented little evidence for the court to review about MMI in 2013 when S&K acquired MMI's collateralized assets. Instead, the trial court focused on MMI as it existed in 2010, ignoring the impact that the stock purchase had on MMI. Likewise, there was little examination of S&K in 2013. In analyzing S&K's successor liability, the trial court should have looked at MMI prior to S&K's acquisition of MMI's assets and S&K after the acquisition for purposes of determining continuity.

Moreover, there was no comprehensive review of MMI or S&K at the time of acquisition in 2013. Instead, the trial court focused on a few facts that supported application of an exception rather than considering the makeup and existence of MMI and S&K in their entirety. With that said, we now turn to the specifics of the continuity and *de facto* exceptions in this case.

The continuity exception focuses on situations in which the purchaser is merely a restructured or reorganized form of the seller. "A mere continuation occurs where 'a new corporation is formed to acquire the assets of an extant corporation, which then ceases to exist.'" ***Continental Ins. Co. v. Schneider, Inc.***, 810 A.2d 127, 134–35 (Pa. Super. 2002), *aff'd*, 873 A.2d 1286 (2005) (quoting ***Knapp v. North Am. Rockwell Corp.,*** 506 F.2d 361, 365 (3rd Cir. 1974) (citations omitted)). Thus, there exists "one corporation which merely changes its form and ordinarily ceases to exist upon the creation of the new corporation which is its successor." ***Id.*** at 134. The primary elements of the continuation exception are identity of the officers, directors,

or shareholders, and the existence of a single corporation following the transfer. *Id.*; *Widerman v. Mayflower Transit, Inc.,* 1997 WL 539684 (E.D.Pa.1997) (citations omitted). "The continuity exception is very limited. The exception turns on the continuity of the corporate entity, not the continuity of the business operation." *Savini v. Kent Mach. Works, Inc.*, 525 F.Supp. 711, 717 (E.D. Pa. 1981) (citing *Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir. 1977)).

In concluding that the continuity exception applied, the trial court explained:

> S&K has the same officers and shareholders as MMI. S&K does the same work as MMI, that is mining and reclamation of mined property. S&K obtained the permits and leases to the Moore Property that were originally MMI's. The employees that worked on the Moore property on behalf of MMI and S&K were also the same. These established facts make it clear that S&K was not a new or unique company but a mere continuation of MMI with the same shareholder and principal, Mr. Taylor. Accordingly, S&K is the appropriate successor to MMI for these claims.

Trial Court Opinion, 8/31/18, at 16.

In reaching its decision, the trial court first concluded that S&K had the same officers and shareholders as MMI. The trial court, however, compared MMI in 2010 to S&K in 2013, and did not consider how the acquisition of MMI by the Holding Company in 2010 affected the makeup and structure of MMI. Instead, the trial court should have considered MMI's corporate makeup and structure in 2013. At that time, Taylor was not a stockholder of MMI. In fact, he had not been a stockholder in MMI for almost three years. Taylor did not

acquire any of MMI's stock upon foreclosure of the loan. There was no evidence that S&K acquired any of MMI's stock either.

Additionally, Taylor was not an officer of MMI and had not been an officer of MMI for almost three years. The evidence regarding the transfer of the Moore permit indicated that Johnathan Lasko was the president of MMI in 2013. There was no evidence that Lasko became an officer of S&K.

Next, the trial court considered the fact that S&K acquired the Moore permit from MMI.[10] The evidence revealed that S&K acquired two of MMI's permits, two of MMI's leases, and equipment. However, from the evidence, it is unclear what portion of MMI's assets this made up. In 2010, the Stock Purchase Agreement listed more than two leases and permits and almost 2 million dollars in equipment. As referenced above, there was no examination of MMI in 2013. Generally, the issue of successor liability arises when there is a significant transfer of one corporation's assets to another. Here, it is not evident that that occurred. Again though, even if it did, the acquisition of assets alone, without satisfaction of one the aforementioned exceptions, is not enough to trigger successor liability.

The trial court also relied on the fact that two employees from MMI became employees of S&K. The two employees moved to S&K in late 2012 after the Holding Company ceased operations. They were equipment operators. Although they worked on the subject property under the Moore

_____

[10] The trial court stated that S&K acquired the Lease for the Moore property but that is not supported by the record.

- 22 -

permit, there is no evidence that these employees were key employees of MMI and critical to S&K continuing the business of MMI. Moreover, in 2010 the Stock Purchase Agreement listed 19 employees of MMI, including the two that eventually transferred to S&K. The transfer of two employees out of 19 does not constitute continuity of employees as suggested by the trial court. Additionally, S&K had other employees, about 7 or 8 other than the two from MMI, and even more employees before that.

Finally, the trial court failed to make any finding regarding the status of S&K and MMI after the transfer of the assets. Important to the application of this exception is that following the transfer, only one entity remains. Here the trial court made no finding regarding this factor. Moreover, upon our review there was no evidence demonstrating that S&K was the only remaining corporation.

Based upon the foregoing, we conclude that the Moore Trust failed to establish that S&K was a continuation of MMI.

We next consider the applicability of the *de facto* merger exception. When determining if a *de facto* merger has occurred, Pennsylvania courts examine four factors to determine the existence of a *de facto* merger:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

- 23 -

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Fizzano Bros. Concrete Prod., Inc. v. XLN, Inc.,* 42 A.3d 951, 956 (Pa. 2012). In making this inquiry, a court must "examine the substance of the transaction to ascertain its purpose and true intent." *Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 310 (3d Cir. 1985).

In concluding that S&K was a successor of MMI, the trial court focused on the first factor. We agree that the evidence showed that S&K and MMI had the same address, S&K acquired some of MMI's assets, and that S&K were in the same business. However, as discussed above, S&K and MMI did not have continuity of the same employees, officers or shareholders. Additionally, the evidence did not show that S&K continued to carry out MMI's enterprise as a whole, or that this was intent behind the transaction at issue.

The second factor has been referred to as continuity of ownership. Establishment of this factor focuses on the transfer between the shareholders of the selling and acquiring entities. Here, there was no exchange of stock between MMI and S&K, or the Holding Company for that matter. Neither S&K nor Taylor acquired any stock from MMI or the Holding Company. That Taylor was previously a shareholder in one company's stock and then a shareholder in another company, does not constitute continuity ownership.

Next, we consider whether MMI ceased existence. As previously noted, the trial court made no such finding, and our review of the record, does not indicate whether MMI continued to exist as a legal entity after S&K acquired its assets.

Finally, we consider whether the purchasing corporation assumed those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation. Here, the evidence disclosed that the only obligation S&K assumed was certain reclamation activities required on the subject property and another property. However, the purpose for assuming this responsibility was not for continuing MMI's enterprise. Taylor explained that S&K acquired MMI's permits to complete the work necessary so that Rockwood would release Taylor from the bonds. The Holding Company agreed to indemnify Taylor for this under the Stock Purchase Agreement, but never did so. Moreover, there was no evidence regarding any of MMI's other liabilities or responsibilities and whether S&K had assumed them as well. We note that under the Stock Purchase Agreement, MMI had had many obligations other than the two addressed during the hearing.

Based upon the foregoing, we conclude that the Moore Trust failed to establish that a *de facto* merger occurred between S&K and MMI.

Because the evidence was insufficient to demonstrate that the applicability of either the continuity or *de facto* exception to the circumstances

of this case, we conclude that the trial court erred in finding that S&K was liable for the "roll-back taxes" as a successor of MMI.

In their fifth issue, Appellants contend that the trial court erred in concluding that the Statute of Frauds did not apply. Specifically, Appellants argue that any promise or agreement to pay the "roll-back taxes" under the Lease by either Taylor or S&K had to be in writing. According to Appellants, because there was no such writing, the Moore Trust's claim is barred. Appellants' Brief at 37. We agree.

The Statute of Frauds provides in pertinent part:

No action shall be brought . . . . Whereby you charged the defendant, upon a special promise, to answer for the debt or default of another, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged there with, or some other person by him authorized.

33 P.S. § 3. However, the Statute of Frauds does not apply if the main object of the promisor is to serve his own pecuniary or business purpose. *Biller v. Ziegler*, 593 A.2d 436, 440 (Pa. Super. 1991); *Acme Equip. Co. v. Allegheny Steel Corp.,* 217 A.2d 791, 792 (Pa. Super. 1966). This exception, known as the "leading object" or "main purpose" rule, "applies whenever a promisor, in order to advance some pecuniary or business purpose of his own, purports to enter into an oral agreement even though that agreement may be in the form of a provision to pay the debt of another." *Biller,* 593 A.2d at 440.

Here, it is undisputed that there was no written agreement from Taylor agreeing to pay the "roll-back taxes" of the subject property. However, the trial court found that the exception to the Statute of Frauds, the leading object rule, applied. Trial Court Opinion, 8/31/18, at 18. The trial court based its decision on Taylor's statement to Mrs. Moore that he guaranteed the contract in an effort to appease Mrs. Moore and to avoid issues with DEP. As the sole shareholder of MMI, Taylor did so to protect his pecuniary interest and business interest. *Id.* Although the determination as to whether a promisor's main purpose for making a guaranty was to serve his own pecuniary or business ends is for the trier of fact, we do not agree that Taylor's statement constituted an oral promise to pay MMI's debts under the Lease.

The statement made by Taylor was very general and overbroad. It did not reference specifically any of MMI's debts or financial obligations, let alone the "roll-back taxes". Moreover, Taylor did not make these statements during a conversation about moneys owed under the Lease. Instead, Taylor made the statements during a discussion with Mrs. Moore about her concerns regarding the condition of the property and environmental compliance. We therefore conclude that Taylor did not agree to pay MMI's debts, and, in particular, did not promise to pay the "roll-back taxes". Given the cautionary purpose for which the Statute of Frauds exists,[11] as well as the higher standard

---

[11] We have previously explained the purpose of this rule:

of proof that our courts have required to establish an alleged oral promise,[12] we must be judicious in applying the leading object rule. Here, there was insufficient evidence to prove that Taylor promised to pay MMI's debt under the Lease, including MMI's obligation to pay "roll-back taxes".

In sum, S&K was not obligated to pay the "roll-back taxes" as it was not a successor to MMI. Furthermore, Taylor was not obligated to pay the taxes, as he never specifically promised to pay them, and his general promise to take care of it was not in writing.

Judgment reversed as to S&K and Taylor.

Judge Musmanno joins the memorandum.

Judge Ott concurs in the result.

---

Promises to pay the debt of another must be in writing for at least two reasons. The first is *evidentiary.* The second, *cautionary.*

****

In addition to its evidentiary role, the provision serves a cautionary function. By bringing home to the prospective surety the significance of his act, it guards against ill-considered action. Otherwise, he might lightly undertake the engagement, unwisely assuming that there is only a remote possibility that the principal will not perform his duty....

E.A. Farnsworth, Contracts § 6.3 (1982).

*Thomas A. Armbruster, Inc. v. Barron*, 491 A.2d 882, 883–84 (Pa. Super. 1985) (emphasis in original).

[12] *Jefferson-Travis, Inc. v. Giant Eagle Markets, Inc.*, 393 F.2d 426, 431 (3d Cir. 1968)

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/16/2019